MATTOCK, Respondent, *v.* GOUGHNOUR, Appellant.

[Argued November 19, 1891.   Decided December 7, 1891.]

New Trial — *Conflict in evidence.* — Where the evidence in a suit to recover wages at the rate of thirty dollars a month for twenty nine and one-half months for caring for certain property is conflicting as to the existence of any contract for hiring, and it appeared that the defendant had no interest in the property so cared for, nor had derived any benefit from such services, and that plaintiff had not spoken to defendant during that period respecting his employment, the case falls within the exception to the general rule, that the verdict of a jury will not be disturbed where the evidence is conflicting, in that the inherent improbability of plaintiff's demand denies to it all claim to belief, and after verdict for plaintiff, the denial of a motion for a new trial made upon the ground of insufficiency of the evidence is error. (*Landsman* v. *Thompson* 9 Mont. 182, cited. De Witt, J., dissenting, upon the ground that the evidence was also conflicting as to whether defendant had any interest in the property cared for, or had derived benefit from plaintiff's services, and therefore the case was not clearly within the exception to the rule.)

*Appeal from Sixth Judicial District, Park County.*

Action to recover for services.   Plaintiff had judgment below. Defendant's motion for a new trial was denied by Henry, J.

*Savage & Day*, for Appellant.

While it is true that the appellate court acts with the greatest caution in reviewing the verdict of a jury for insufficiency of the evidence, yet its power to review and reverse that verdict is

well settled, and one of the safeguards thrown around litigants. So great is the desire to refrain from interfering with the province of the jury that the rule is now almost universal that when there is a substantial conflict in the evidence upon a material point, the Supreme Court will not pass upon the sufficiency of the evidence to sustain the verdict. But it is equally well settled that this rule does not apply where the evidence relied on to sustain the verdict is in itself contradictory or improbable.

In the case of *Branson* v. *Caruthers*, 49 Cal. 381, the question was whether the plaintiff was in the employ of the defendant in a certain capacity at a certain time. The plaintiff explicitly denied the employment, but the defendant contradicted this testimony, and two other persons testified to admissions of the plaintiff that he was in the defendant's employment in the capacity and at the time in question, and the plaintiff in the course of his testimony contradicted a material fact which he had sworn to in his pleadings. The Supreme Court reversed a judgment, based on the verdict finding that there was no such employment, on the ground that the plaintiff's evidence could not be relied on. For the same reason the rule was set aside in the case of *Guerrero* v. *Ballerino*, 48 Cal. 121; *Franklin* v. *Dorland*, 28 Cal. 178, 179; 87 Am. Dec. 111; *Carpentier* v. *Gardiner*, 29 Cal. 164; *Walsh* v. *Hill*, 41 Cal. 571. Even when there is no apparent conflict in the evidence upon a material point the verdict may be set aside, where the presumption that the witness testifying upon the point told the truth is rebutted by the improbability of what is testified to, or by contradictions in the testimony. (*Blankman* v. *Vallejo*, 15 Cal. 645; *Crook* v. *Forsyth*, 30 Cal. 662; *Bernal* v. *Wade*, 46 Cal. 667. See on the whole subject, 2 Hayne on New Trial and Appeal, § 228.)

*Allan R. Joy*, for Respondent.

The jury determined the weight and credibility of all the witnesses who testified in the case, and they were instructed that in construing an alleged contract sued upon, that it was their province to ascertain from the evidence the real intention of the parties at the time of the alleged making of such con-

tract. (*Lyman* v. *Bank of United States*, 12 How. 244; *Bonnell* v. *Chamberlin*, 26 Conn. 487; *Horner* v. *Hower*, 49 Pa. St. 475; *Connecticut T. etc. Co.* v. *Melendy*, 119 Mass. 449.)    There was evidence of the making of the contract as sued upon, and the jury determined that it was of sufficient weight and credibility to base a verdict upon.    Even if there was any conflict in the evidence, the courts regard that as settled by the verdict of the jury, and though the weight is against it, adopt that view of the evidence which agrees with the verdict. (*Frank* v. *Murray*, 7 Mont. 11; *Story* v. *Black*, 5 Mont. 26; 51 Am. Rep. 37; *Beck* v. *Beck*, 6 Mont. 285; *Knox* v. *Gerhauser*, 3 Mont. 276; *Davis* v. *Blume*, 1 Mont. 463; *Mason* v. *Germaine*, 1 Mont. 279; *Lincoln* v. *Rodgers*, 1 Mont. 217; *Travis* v. *McCormick*, 1 Mont. 347.)

Where there is a conflict of testimony the court will not reverse the order denying a motion for a new trial. (*Beck* v. *Beck*, 6 Mont. 286; *Lincoln* v. *Rodgers*, 1 Mont. 217; *Toombs* v. *Hornbuckle*, 1 Mont. 286; *Ming* v. *Truett*, 1 Mont. 322.) Neither will the appellate court disturb the verdict on the ground of insufficiency of evidence to justify the verdict or other decision. (*Hunt* v. *Elliott*, 77 Cal. 588; *Witter* v. *Hoover*, 24 Neb. 605.)    The general rule is, that the appellate court will not disturb a judgment, or verdict, or finding, or order denying a new trial or granting a new trial, where there is a substantial conflict in the testimony.    The Supreme Court has often held that it would not interfere with the verdict of the jury on the ground that such verdict is against the weight of evidence.    It is almost impossible for an appellate court to satisfy itself in a decision upon such matters, so much depends upon the manner, bearing, character of witnesses, and the peculiar circumstances which the transcript fails to preserve, which give weight and value to testimony. (*Kimball* v. *Gearhart*, 12 Cal. 27; *Johnson* v. *Pendleton*, 1 Cal. 133; *Scannell* v. *Strahle*, 9 Cal. 177; *Weddle* v. *Stark*, 10 Cal. 301; *Ritter* v. *Stock*, 12 Cal. 402; *Visher* v. *Webster*, 13 Cal. 60; *Brown* v. *Smith*, 10 Cal. 508; *Lewis* v. *Covillaud*, 21 Cal. 178; *Preston* v. *Keys*, 23 Cal. 193; *Lubeck* v. *Bullock*, 24 Cal. 338; *Ellis* v. *Jeans*, 26 Cal. 275; *Wilcoxson* v. *Burton*, 27 Cal. 232; 87 Am. Dec. 66; *Wilkinson* v. *Parrott*, 32 Cal. 102; *Livermore* v. *Stine*,

43 Cal. 275; *Price* v. *Sturgis,* 44 Cal. 591; *Witherby* v. *Thomas,* 55 Cal. 9.)   When the evidence is conflicting, it must be assumed on appeal that the evidence tending to support the judgment is true.   (*California Bank* v. *Sayre,* 85 Cal. 102; *Harris* v. *Frank,* 81 Cal. 280.)   Judge Shafter goes so far as to say, in 32 Cal.: "While we think the verdict against the weight of evidence, still, when tested by the settled doctrines of this court, the case is not one that would justify an assertion of our own views in opposition to the verdict of the jury and the ruling of the court before which the case was tried." (*Kile* v. *Tubbs,* 32 Cal. 339.)   The Supreme Court of California holds, that where evidence is contradictory, that in support of the verdict must be assumed to be true.   (*Woody* v. *Bennett,* 88 Cal. 241.)

BLAKE, C. J.—The complaint contains two causes of action, and alleges that the plaintiff performed work and labor for the defendant between October 26, 1888, and April 10, 1891, at the special instance and request of defendant, for the sum of $30 per month, which was the price agreed upon by the parties October 26, 1888, "so long as plaintiff should continue in defendant's employ;" that "defendant has never been discharged from such services;" that "defendant has paid thereon the sum of $171 for the first five months and twenty-one days, and no more; and that all of said wages due, earned, and owing to this plaintiff from the seventeenth day of April, 1889, to the eleventh day of April, 1891, constantly and without any loss of time, amounting to the sum of $714, is now due and wholly unpaid to this plaintiff."   The second cause of action is founded upon an instrument in writing, a due-bill, which is set forth, and it is alleged that the defendant is indebted to the plaintiff in the further sum of $266 by reason thereof.   The answer denies specifically the averments of the complaint regarding the first cause of action, and says that the due-bill has been paid.   The jury returned the following verdict: "We, the jury, find for the plaintiff in the sum of $714 on the first count, and in the sum of $11 86-100 on the second count."   Judgment was entered thereon, and the defendant moved for a new trial upon the ground that the evidence is insufficient to sustain

the verdict. The motion was overruled, and the defendant appealed.

The evidence will be stated fully. The plaintiff testified: "I know the defendant, Mr. Goughnour. On April 20th, Myron Goughnour had some stock on the island, and Mr. Goughnour hired me to go over on the island and take care of it. I was told that the stock belonged to Myron Goughnour. I took care of it, and helped to brand the stock, and on the 25th of October, 1888, Mr. Goughnour settled up with me. There was about fifty head of stock, and it was sold as soon as possible, as Myron was going to move off the island, and wanted to go away. The stock was sold in October, and Myron moved off, and I moved where Myron was living. On the day of our settlement I asked Mr. Goughnour if I could go over on the island and work for him. He said, 'Yes, you may go over there and take care of what is left there,' and he would pay me $30 a month. I saw Mr. Goughnour frequently after that, but had no conversation with him, except to pass the time of day, only when I went to him for $10, or something of the kind. I was to get $30 a month. I commenced work under the new contract on the 26th of October, 1888, after I was discharged, and have been down there continuously. Mr. Goughnour told me that he was going to sell the island soon. I worked for the defendant twenty-nine and one-half months. It amounted to $700 and something. My services on the island were worth $30 a month. Mr. Goughnour still owes me $980, of which $700 and something is for wages." Upon cross-examination the plaintiff testified: "Mr. Goughnour hired me to work on the island, and I went over there and took care of about fifty head of stock that Myron Goughnour had there. The first time was in April, 1888, and I remained until the 25th of October. I was getting $30 a month, and was looking after the stock Myron had there. After the stock was sold, and we had a settlement, I was looking after the island and the things left there — some farming implements, rake, plow, and other machinery. The things are there now. I had a pony on the island. Mr. Goughnour hired me to go there on the 25th of October. I asked him if I could go and work for him on the island. He said, 'Yes, you can go over there; but I have not much for you

to do. You can go over there and take care of what is left there, and Myron Goughnour & Co. will pay you for any extra work you do.' Mr. Goughnour said if any one put up a shack over there to notify him at once. My services were worth $30 a month. I was taking care of everything that was left there, and I was boarding myself. It was a lonesome place to be, and worth $30 or nothing. Mr. Goughnour owes me since the 25th of October, 1888, $700 and something. I made a demand for it in January of this year. I remained there from the 25th of October, 1888, to January, 1891, without demanding pay for my services. I bought some hay from Mr. Goughnour, and he bought four or four and a half tons of hay from me." He testified on redirect examination: "I sold Mr. Goughnour $84 worth of hay."

L. S. Owen was called by the plaintiff, and testified: "In January, 1890, I was in Mr. Goughnour's office, and he was going to get some one to take care of the teams on the island, and he told me that I could go and take care of them, but that I would have to move in the house with the man. I was not acquainted with Mr. Mattock at the time, and I asked if I could not go in the old house down by the stable. Mr. Goughnour said: ' Yes, that's all right, and will satisfy me all around.' I said it might not satisfy the man living there, and he said it would have to satisfy him, as he (Mr. Mattock) was working for him (Mr. Goughnour), the same as I would be. I think Mr. Mattock has been living there ever since. I have seen him three or four times on the island. He is still on the island." Upon cross-examination the witness testified: "I went and remained on the island, taking care of the teams. Mr. Mattock was doing nothing particularly. This was in the winter, and he was looking after the things that were left there." The plaintiff then rested the case.

The defendant testified: "I wish the jury to understand that I had never any interest individually in this island or the property there. In the spring of 1888 I took charge of the affairs of Myron Goughnour, as trustee. The horses and cattle were held distinct. I took possession of them, and had Mr. Mattock to take care of them. Myron was going to move away. He was never in my employ after October 25, 1888. On the 26th

of October I perfected a sale of the cattle of Myron Goughnour & Co. Mattock came in, and we had a final settlement of the whole affair that day, and the due-bill sued on includes my individual account, and the whole business was settled up, and Mattock went away. The next day he came to my office, and asked me if he might return to the island and work for me. I said simply this: 'I have no further use for you; nothing for you to do particularly; but you can return to the island and take care of what there is there.' As regards the wages, I told him that I thought Goughnour & Co. would probably pay him for what his time was worth. I never hired Mr. Mattock in the spring of 1888. He did no work for me in 1888. . . . . There was nothing on the island after the 25th of October, 1888, belonging to me. I know Mr. Owen, who testified in the case. I made no statement to him that Mr. Mattock was in my employ." Upon cross-examination the defendant testified: "I had no control over the things that were on the island after the 25th of October. I do not know that I was ever dismissed as a trustee of Myron Goughnour & Co. No person was ever appointed to succeed me. I sent some teams over there, and offered to sell the island, but simply offered it for other parties. I had authority to sell for somebody else. I took charge of the business of Myron Goughnour & Co. in May, 1888. The island was a part of the assets. I have no machinery over there. The property belonged to Myron Goughnour & Co. I had no charge of the machinery. My administration ceased when I settled up the affairs as trustee, and I never had any more management of this business after that. I sold all the property of the company that was salable. I never saw the mowing-machine." The defendant then rested.

The plaintiff was recalled, and testified: "The firm of Myron Goughnour & Co. was composed of Myron Goughnour, A. L. Love, and Mr. Mund. Myron was superintendent. I went over on the island the same day we had our settlement. In the evening, after we settled our account, I asked him if I could not move in the old house, on account of feeding hay, and he said, 'Yes.' I went up and got my key and wagon blankets, and was staying there under the same contract. The only conversation had with Mr. Goughnour about work was

with Mr. Goughnour on October 25, 1888." Upon cross-examination the plaintiff testified, "I had some ponies on the island."

We have recited all the evidence relating to the motion for a new trial which appears in the transcript. When the record is examined, it will be seen by the testimony of the plaintiff that he was employed in October, 1888, to perform labor at a stipulated sum per month; and the testimony of Owen, with relation to the admission of Goughnour that Mattock was working for him (the defendant), is contradicted. The attention of the court below seems to have been restricted to these issues in the consideration of the motion for a new trial, and the verdict was not disturbed because there is a substantial conflict in the evidence. But we are of the opinion that the case at bar comes clearly within an exception to this general rule. There is testimony of other matters, which was not controverted by the plaintiff, after he was recalled, and is relevant, and shows that the cause stands upon an improbability.

The island and certain personal property were assets of the firm of Myron Goughnour & Co., and the defendant acted as a trustee in the settlement of its affairs, and had no personal interest in the business. The plaintiff knew these facts, and was employed from April 20, 1888, to October 25, 1888, by the defendant in his fiduciary capacity. The plaintiff was paid in full, and the matters of the firm were closed prior to the making of the contract which is set forth in the complaint. During the period which is covered by the alleged employment of the plaintiff, the defendant was not interested as an individual or trustee in the island, or any property thereon. There was no way in which the services of Mattock could be of any benefit to the defendant. Would any person, under these conditions, agree to pay another wages at the rate of $30 per month?

During the time which is specified in the complaint—twenty nine and one-half months—the plaintiff did not speak to the defendant respecting this labor. He testified: "I saw Mr. Goughnour frequently after that, but had no conversation with him except to pass the time of day, only when I went to him for $10, or something of the kind." The parties acted like strangers, and this conduct, under the circumstances which

have been narrated by the plaintiff, is contrary to the experience of men. It is always necessary and proper that directions concerning the character of the labor be given by the employer, and that the servant should make reports from time to time touching his duties. Yet such subjects of business of vital importance were never topics of conversation, inquiry, or consultation, and a large indebtedness was incurred before a demand for its payment was made. The plaintiff does not testify that any amount was ever paid by the defendant by reason of his services, although the complaint alleges that a payment of $171 has been made therefor. The jury found that the sum of $11.86 was due on account of the written obligation for $266, which was in effect a finding that the sum of $254.14 had been paid thereon.

The defendant never recognized by any act the contract which is sought to be enforced in this action. The fact that he had nothing for the plaintiff to do, when considered with all the evidence, is sufficient to justify the court in holding that this claim is unreasonable and improbable. The doctrine which is applicable has been laid down in *Blankman* v. *Vallejo,* 15 Cal. 638, in which it is said: "A court may reject the most positive testimony, though the witness be not discredited by direct testimony impeaching him or contradicting his statements. The inherent improbability of a statement may deny to it all claims to belief." (See Hayne on New Trial and Appeal, § 288, and cases cited; *Crook* v. *Forsyth,* 30 Cal. 662; *Guerrero* v. *Ballerino,* 48 Cal. 118; *Branson* v. *Caruthers,* 54 Cal. 374; *Mogk* v. *Peterson,* 75 Cal. 496; *Baker* v. *Fireman's Fund Ins. Co.* 79 Cal. 34; *McLennan* v. *Bank of California,* 87 Cal. 569; *Landsman* v. *Thompson,* 9 Mont. 182.) We are convinced that the court abused its discretion in overruling the motion for a new trial.

It is ordered and adjudged that the judgment be reversed, and that the order appealed from be set aside, and that the cause be remanded for a new trial.

*Reversed.*

HARWOOD, J., concurs.

DE WITT, J. (*dissenting*).— The title-head of section 288 of Mr. Hayne's able work on New Trial and Appeal is: "Where there is a substantial conflict in the evidence the Supreme Court

will not disturb the decision of the court below." And such has been the doctrine of this court since early in its organization. (*Lincoln* v. *Rodgers*, 1 Mont. 217; *Travis* v. *McCormick*, 1 Mont. 347; *Davis* v. *Blume*, 1 Mont. 463; *Toombs* v. *Hornbuckle*, 1 Mont. 286; *Ming* v. *Truett*, 1 Mont. 322; *Kinna* v. *Horn*, 1 Mont. 597; *Orr* v. *Haskell*, 2 Mont. 225; *Knox* v. *Gerhauser*, 3 Mont. 267; *Story* v. *Black*, 5 Mont. 26; 51 Am. Rep. 37; *Beck* v. *Beck*, 6 Mont. 285; *Frank* v. *Murray*, 7 Mont. 11; *Chauvin* v. *Valiton*, 7 Mont. 581; *Kilby* v. *Baker*, 9 Mont. 398; *Landsman* v. *Thompson*, 9 Mont. 182; *Cunningham* v. *Quirk*, 10 Mont. 462.)

The author above quoted, after stating the rule, and commenting upon the California cases, goes on to remark: "That the reason of the rule is as stated by the learned justices above quoted admits of little doubt; and it is easily seen that this reason does not require the court to respect a verdict or decision in support of which the testimony, though direct and positive, is grossly improbable, or open to the gravest suspicion on other grounds. Such considerations may outweigh the advantage which the jury had of seeing the witnesses and observing the manner of their testifying. . . . . But, whatever may be its precise application and limitation, the rule itself is, as above stated, as well settled as anything can be. . . . . As above stated, where there is no substantial conflict in the testimony upon any material point, and the verdict or finding is against the evidence upon such point, it will be set aside by the Supreme Court. This is upon the presumption that the witness told the truth. But this presumption may be rebutted by the improbability of what is testified to, or by contradictions in the testimony. This was clearly stated by Baldwin, J., in *Blankman* v. *Vallejo*, 15 Cal. 645," cited in the opinion of the majority of the court in this case, and also in *Landsman* v. *Thompson*, 9 Mont. 182. The California court said: "We do not understand that the credulity of the court must necessarily correspond with the vigor and positiveness with which a witness swears. A court may reject the most positive testimony, though the witness be not discredited by direct testimony impeaching him or contradicting his statements. The inherent improbability of a statement may deny to it all claims to credibility."

The appellant, in the case at bar, seeks to apply the principle last referred to. He subscribes to the general rule stated by Mr. Hayne from the authorities, but argues that the improbability of plaintiff's statements, and the contradictions therein, are so great that they destroy the whole force of his testimony, and rob it of all weight.

The opinion of the majority of the court recites the evidence in full, so far as it appears in the record, and holds that this case falls within the exception to the rule above stated. But is the testimony of plaintiff "grossly improbable?" Is it "open to the gravest suspicions?" Is there "no substantial conflict in the testimony on the material points?" I shall examine the evidence somewhat in detail, in order to satisfy my mind upon this point.

Were plaintiff's statements inconsistent and contradictory to such an extent that they must be disregarded? First, he testified directly as to the employment by defendant, the promise to pay, and the rendition of the services. Again, on cross-examination, he says that Goughnour told him that he had not much for him to do, and that Myron Goughnour & Co. (a concern, as we understand the record, separate from defendant) would pay him for any extra work he did. Appellant contends that this is a contradiction which destroys the credit of plaintiff's testimony. For all that appears, it may well be that taking care of the personal property on the island, and the island itself, and watching to see whether any one trespassed upon the island, was not "much to do," but defendant was the person to determine whether he needed such services, and, if he desired them performed, they may, for all that appears, have been very important and valuable to him, although they did not require much time for their performance. It cannot be held that the value of any service depends wholly upon the time required for its rendition. That defendant should bargain for a certain service, requiring, perhaps, but little time, and then be willing that his employee should do extra work for some one else, providing that it did not interfere with the labor he was to render his regular employer, does not occur to me as such an unusual and peculiar condition that the statement of its existence should brand the testimony of the witness with contradiction and

inconsistency, so that we should conclude that the District Court had abused its discretion in refusing the new trial.

Again, is the inherent improbability of plaintiff's testimony so great as to tax credulity? This inquiry may be answered upon the same considerations as advanced in the last paragraph. The plaintiff was the custodian of personal property on the island, and a watchman upon the island, not only of the personal property, but of the island as well. He was instructed to inform his employer if any one put up a shack on the island. It does not appear that the value of the personal property was trifling, or that it was a matter of small moment to the defendant if some one came upon the island, and seemed to initiate the appearance of taking possession of the ground. It can readily be conceived that such a matter was of the highest importance to defendant. It does not appear that it was not. It does not appear that it was so insignificant that it must be concluded that it was inherently improbable that defendant would employ a man at $30 per month for the service described.

Now, wherein is the "gross improbability" of plaintiff's position? Wherein is "it open to the gravest suspicion?"

It is said that the testimony of plaintiff that he was employed, and that the testimony of Owen as to Goughnour's admission that plaintiff was employed by him, are contradicted by the defendant. That is true, but plaintiff and Owen are not impeached. Their testimony, for all that appears, is as good as Goughnour's. There is here certainly a conflict of evidence, and with a preponderance, at least in number of unimpeached witnesses, in favor of plaintiff and the verdict.

Again, it is said that plaintiff knew that the island and the personal property were the assets of the firm of Myron Goughnour & Co., and that defendant had no personal interest in the business. Plaintiff says that the cattle, which he had taken care of before his employment under the alleged contract in controversy, belonged to Myron Goughnour & Co. Defendant says that this was the fact, but defendant does not say that he told the plaintiff so, or that plaintiff knew it. Therefore, it does not appear, as far as I am able to discover, that plaintiff knew that defendant had no interest, personal or as a trustee, in the island, or the personal property thereon, subsequent to October 25, 1888.

And it is far from being admitted by the evidence that defendant had no such interest.    Whether he did or not was a disputed question of fact, according to the evidence, and it was disputed in this manner: Defendant, on his part, testified directly that he had no such interest.    I am of opinion that, if a man employs another at $30 per month to take care of a rake, plow, and machinery, and to watch an island, and to give information if any one starts a building on the island, such acts are evidence that such employer has an interest in such property; and in this case those acts were testified to by plaintiff.    It is contrary to my observation of humanity that a man will spend his money for an object in which he has no interest.    I speak of this evidence at this point only as evidence that defendant did have an interest in the personal property and the island.    It has been assumed that there was no evidence of such interest. Therefore, it is not an uncontroverted fact in the case, as I am enabled to view it, that defendant had no interest in the property.    It comes to this: Defendant testified that he had no interest.    Plaintiff testified to facts which, in the ordinary course of human nature, were evidence that he had an interest. Proof of acts is stronger than asseveration.    That is what this conflict was.    If defendant says one thing, and his acts are shown which prove another, his conduct is more convincing than his words.    Of course, he denies this alleged conduct on his part.    But that simply brings us back to a conflict in the evidence, a conflict between unimpeached witnesses, a conflict which the jury resolved in favor of plaintiff.

On the ground that it is admitted that defendant had no interest in the personal property and the island, the majority of the court concludes that there was no way in which plaintiff's services could be of any benefit to defendant, and that, under those circumstances, no one would agree to pay another $30 per month; and that, therefore, plaintiff's contention is improbable and unreasonable.    But, as I have above observed, it is not admitted that defendant had no interest.    It is disputed, and the ground upon which the majority base their conclusion I cannot discover to exist.

Again, the improbability of plaintiff's claim is found by the majority of the court in the fact, as stated, that during the em-

ployment plaintiff did not speak to defendant respecting the labor, and that their conduct is contrary to the experience of men; that it is necessary and proper that directions concerning the labor should be given by the employer, and that the servant should report from time to time touching his duties; and that such business of vital importance was never a topic of conversation, inquiry, or consultation between the parties. In these facts is found the inherent improbability of plaintiff's claim. Let us see. What was plaintiff to do? To take care of some inanimate personal property, an island in the river, and to report if any one commenced building on the island. What was there for the employer to give directions about? What was there for the employee to report? What were the vital matters demanding consultation? It is not as if there were varying duties for the servant. It is not as if the property were live stock, as to which the owner would desire to give orders, and receive reports as to their care, their increase, or their death or straying away, or their branding at the proper season. When the employer once gave his directions to take care of the machinery and the island, and to advise him if any one put a shack thereon, there was nothing more to be said by him, or reported by the employee, as long as the personal property remained uninjured, the island stayed in the river, and no one trespassed thereon. And, for all that appears, affairs remained in this condition. I can discover in these facts no "gross improbability," nothing that taxes my credulity, that I should set aside a verdict of a jury, on an appeal from an order declining to disturb it.

Again, the unreasonableness and improbability of plaintiff's claim is found in the fact, as the majority of the court view the case, that defendant never recognized by any act the contract under which plaintiff claims; that he never paid anything on it; and, although the complaint alleges a payment of $171 on the contract, the plaintiff did not testify that the defendant had paid him any amount on the contract.

The record does not purport to contain all the evidence produced on the trial, and it therefore does not appear that plaintiff did not testify to this allegation in the complaint.

The complaint contains two counts. The first is for 29½ months' labor at $30 per month, amounting to $885. Partial

payment is alleged of $171. The balance claimed as due is $714, which is the gross amount, less the payment. The second count is upon a due-bill for $266.

The jury found that there was due on the due-bill $11.86, which the majority opinion observes is a finding that $254.14 had been paid thereon.

The jury did not find a lump verdict as to the two counts. Here are their words: "We, the jury, find for the plaintiff in the sum of $714 on the first count, and in the sum of $11.86 on the second count."

What did that verdict mean as to the first count? Adopting the reasoning of the majority opinion as applied to the verdict on the second count, then, as to the first count, when the jury found an amount — $714 — equal to the total claimed by plaintiff, less the credits admitted and alleged by him, it was a finding that the credits existed, or, in other words, that the payments had been made; and, if such payments had been made on account of the contract, it was very substantial evidence in support of the verdict. But I do not adopt that reasoning or propose that argument. I only suggest it as being on the same lines as that of the majority opinion, by which that opinion concludes, from the verdict, that whatever payments were made were made on the due-bill and not on the contract. There is as much in the record to satisfy one that the jury found by their verdict that defendant had made payments on the contract, as that he had made them on the due-bill, and the one conclusion may be as legitimately drawn as the other.

But for what does this count, in any event? Admit, for the purposes of the decision, that it does not appear that any payments were made by defendant on the contract. Must we find that the existence of a contract of employment is improbable and unreasonable because the employee has not been paid anything on account of his labor? If that be good, it suggests a very simple defense to actions. But, of course, one can conceive of circumstances where, if no payments had been made an employee for a long period like twenty-nine and one-half months, a presumption might be suggested that he was not employed. But such circumstances are not here found. The plaintiff seems to have been a man of simple tastes and wants. He was living

alone, most of the time, on an island, away from the allurements and expenses of a city. He had shelter, bed, and a pony. He boarded himself. His expenses were manifestly nominal. He went to Goughnour for $10 when he needed it. For all that appears, Goughnour was solvent, and able to pay. Nothing appears but that Goughnour was a safe custodian of plaintiff's balance of wages, until such time as plaintiff needed them. As long as plaintiff's present wants were supplied, as it appears that they were, was it a strange thing that he should leave his wages to accumulate with his employer? Is that contrary to the experience of men? Is it such an improbable, unreasonable, incredible state of affairs that this court must say that this cannot, in the nature of things, be true? I think not. The conditions seem to me quite natural.

I think that there can be no difference of opinion between the majority of the court and myself as to the rule, upon a review of a verdict claimed to be unsupported by the evidence, and as to the exception to the rule the doctrine is too well established. The only difficulty is that we cannot agree upon the application of the facts in this case. An analysis of them satisfies me that the case does not fall within the exception. I find a substantial conflict in the evidence between unimpeached witnesses. When I look for any "gross improbability" in plaintiff's claim or testimony, I fail to find it. It is not, to my mind, "open to the gravest suspicion." The construction of the facts by the majority of the court seems to me to tread too closely upon the province of the jury, and to trench upon the doctrine of the heretofore adjudicated cases in this court.

I am of opinion that the order denying the motion for a new trial should be affirmed.