McINTYRE, Administratrix, Appellant, v. NORTHERN
PACIFIC RY. CO. et al., Respondents.

(No. 3,984.)

(Submitted March 21, 1919. Decided May 2, 1919.)

[180 Pac. 971.]

*Railroads—Trespassers—Personal Injuries—Death—Last Clear
Chance Doctrine—Evidence—Insufficiency—Directed Verdict
—Evidence—Offer of Proof—Expert Witnesses.*

Railroads—Trespassers—Use of Tracks—Presumptions.
1. Engineman engaged in switching operations in a railroad yard
where decedent was trespassing, had the right to assume that the track
was clear.

[As to the duty of railroads to keep their stations safe for passengers and others, see note in 29 Am. St. Rep. 55.]

Actionable Negligence—What Constitutes.
2. Actionable negligence arises only from a breach of legal duty.

Railroads—Trespassers—Last Clear Chance Doctrine.
3. Under the doctrine of the last clear chance, the duty of defendants
to avoid injury to decedent arose only when he was actually discovered
in a position of peril and apparently unconscious of danger or unable
to extricate himself, and failure thereafter to exercise reasonable care
to avoid injury constitutes negligence.

Same—Last Clear Chance—Burden of Proof.
4. Where plaintiff in an action to recover damages for the death of
a boy caused by being run over by a switch engine in a railroad yard
within the corporate limits of a city, alleged in the complaint based
upon the last clear chance doctrine, that the members of the engine
crew saw decedent in a position of peril, which allegation was denied,
the burden of proving such charge directly or by circumstantial evidence was upon plaintiff.

Same—Last Clear Chance—Evidence—Insufficiency.
5. Evidence in an action to recover damages for the death of a boy,
a trespasser killed in defendant company's railroad yard, tried upon
the theory that recovery could be had only under the last clear chance
doctrine, *held* insufficient to warrant submission of it to the jury upon
the issue framed by plaintiff's allegation and defendant's denial that
the engine crew saw decedent in a position of peril in time to avoid
striking him. (Mr. Justice Cooper dissenting.)

For authorities passing on the question of duty of railroad company
to keep lookout for trespassers on track, see notes in 8 L. R. A. (n. s.)
1069; 41 L. R. A. (n. s.) 264.

On application of doctrine of last clear chance in case of trespassers
or others injured on railroad track, see notes in 55 L. R. A. 418; 36
L. R. A. (n. s.) 957.

On burden of proof as to contributory negligence, see comprehensive
note in 33 L. R. A. (n. s.) 1085.

Trial—Evidence—Insufficiency—Directed Verdict—When Proper.
6. Whenever the evidence is in such condition that, if the case should be submitted to the jury and a verdict returned for plaintiff, it would be the duty of the court to grant a new trial, the court may direct a verdict for defendant.

Same—New Trial—When Proper.
7. The legal duty to grant a new trial arises whenever the evidence, in weight, does not justify the verdict.

Same—Inherently Weak Evidence—Directed Verdict.
8. Where plaintiff has tendered some evidence in support of his complaint which, however, because of its inherent weakness, is legally insufficient to sustain a verdict, the court may direct the jury to find for defendant.

Same—Positive Testimony—Rejection—When Proper.
9. Courts may reject the most positive testimony of a witness if his statements are inherently improbable or present a state of facts physically impossible.

Same—Directed Verdict—When Proper.
10. Though, on defendant's motion for a directed verdict, plaintiff's evidence will be considered as proving every material fact which it tends to prove, there must be substantial evidence to justify a verdict, else the motion should be granted; mere suspicions, conjectures or speculations being insufficient upon which to base a verdict.

Same—Motion for Directed Verdict—Effect.
11. Defendant's motion for directed verdict was in effect a demurrer to the evidence, raising the question of its legal sufficiency to establish plaintiff's case.

Railroads—Expert Testimony—Offer of Proof—Proper Rejection.
12. An offer to prove by a witness not shown to be qualified to give an opinion upon the question whether a locomotive engineer from his position in the cab could see a person on the track nine feet from the end of the tender, was properly rejected.

Judgments—Codefendants—Nonappearance of One—Jurisdiction.
13. Where one of several defendants was not served with summons and made no appearance, a judgment in favor of all defendants will be modified by inserting the names of those defendants of whose persons the court had jurisdiction.

*Appeals from District Court, Silver Bow County; J. J. Lynch, Judge.*

Action by Muriel McIntyre, as administratrix of the estate of Fred Lautwe, deceased, against the Northern Pacific Railway Company, and others. From a judgment for defendants, and an order denying her a new trial, plaintiff appeals. Modified and affirmed.

*Mr. N. A. Rotering,* for Appellant, submitted a brief, and argued the cause orally.

*Messrs. Walker & Walker* and *Messrs. Gunn, Rasch & Hall,* for Respondents, submitted a brief; *Mr. Carl Rasch* argued the cause orally.

MR. JUSTICE HOLLOWAY delivered the opinion of the court.

This action was brought to recover damages for the alleged wrongful death of Fred Lautwe, who was killed in the railroad yards at Butte in December, 1915, by being run over by a Northern Pacific locomotive in charge of Engineer C. A. Lawrence. The fireman, Williams, and brakeman, Finnegan, were joined as defendants.

It is alleged in the complaint that at the time of the accident the deceased was carelessly and negligently upon the railway right of way in a place of danger, but unobservant of the approach of the locomotive; that the individual defendants saw the deceased, saw that he was in imminent peril, and that he was apparently unconscious of danger; that by the exercise of ordinary care they could have avoided injuring him, but, notwithstanding these facts, they negligently, carelessly, wantonly and willfully drove the locomotive over him, inflicting injuries which caused his death. The answering defendants admitted that the boy was killed, that he was negligently upon the railway track, and denied all the other material allegations of the complaint.

Upon the trial of the cause, and at the conclusion of the evidence the court directed a verdict for defendants, and judgment was entered accordingly. Plaintiff appealed from the judgment and from an order denying a new trial.

The complaint was drawn and the cause tried upon the theory that recovery could be had only under the last clear chance doctrine. The principal contention made by appellant is that sufficient evidence was introduced to establish *prima facie* that the members of the engine crew saw the boy in a place of imminent peril in time to stop the locomotive and avoid the injury.

On the afternoon of December 10, 1915, a south-bound Oregon Short Line train was made up on the "boot" track immediately

north of the platform of the Northern Pacific passenger station in Butte.  The train was complete, except for a locomotive and dining-car.  The dining-car of an incoming train was to be attached to the outgoing train, and to effect this change a switch engine—the locomotive in question—was employed.  It was attached to the mail-car, baggage-car, smoking-car, and day coach; the engine facing these cars toward the east with the tender to the west.  As soon as the incoming train arrived, the switch engine, with the cars attached, backed to the west to secure the dining-car, and in so doing ran over the Lautwe boy, causing his death.  In addition to the foregoing facts which are not in dispute, the plaintiff, the boy's mother, testified: That she was on the boot track near the Oregon Short line freight-house at a point where Delaware Street, if extended, would cross the track; that she was looking to the east searching for her boy; that she saw a boy narrowly escape injury from the incoming train on the main line track immediately south of the platform; that he ran to the north and stood in the middle of the boot track, about twenty-five or thirty feet west of the west end of the tender of the switch engine, looking to the southwest, apparently watching the incoming train; that the switch engine moved to the west at the rate of two or three miles per hour; that the footboard of the tender struck the boy in the back, knocking him forward to the ground between the rails; that he was dragged ten or fifteen feet before the body disappeared under the tender; that Engineer Lawrence was looking out of the cab window, facing westward, "and was looking toward the boy, and should have seen the boy from where he was looking.  The boy was directly in his vision, directly in line with where Lawrence was looking. * * * This accident occurred, I should say, between half-past 4 and 5, and it was daylight. * * * When the switch engine started to back, I could see Mr. Lawrence leaning out of the cab window and looking toward me. * * * I did not know, at the time he was knocked down, that it was my boy. * .* * I couldn't say how many feet I was from where the boy was struck, but was quite a distance, too far to call to the

boy. * * * When Engineer Lawrence was looking out, leaning out of the cab window, he was looking at the boy, and the movements of the boy.''

Ralph Shook testified, for plaintiff: That he, Walter Burgman, and another boy were standing about twenty-five feet north of the tender of the switch engine; that they had crossed the switch track a few seconds before, and did not see the Lautwe boy; that, after the switch engine began to move to the west, Walter Burgman called out, and then ''I turned west and saw the engine just about to hit the boy, and we both started to hollo''; that the fireman was in the cab looking west, and the boy was west of the engine and directly on the track, about the middle of the track, and ''when I first saw him, he was about nine feet from the engine.''

The engineer testified that, about five minutes before he started to move the locomotive, he saw the Lautwe boy pass down the platform to the west with an armful of wood, then around the tender to the north, where he disappeared, and that he never saw him again until after he was dead. The brakeman testified to substantially the same facts. The fireman testified that he never saw the Lautwe boy after getting upon the engine; that after the engine started to move he heard some boys on the team track holloing, ''Look out!'' and ''before I could realize that anything had happened I heard the engineer bringing the engine to a stop.'' The engineer testified that his attention was first directed to the fact that something was wrong by motions made by the mail clerk on the incoming train; that he looked down from the cab window to the rail, and saw the boy's head after it had been severed from the body, and that he had immediately brought the engine to a stop. Each of the individual defendants testified that, a few days before trial, he made tests with a locomotive of the same type and size as the one in service on the day of the accident—that particular locomotive having been wrecked in the meantime—and that looking from the cab window it is impossible to see a person on the track if he is as near to the tender as the evidence indicated that the Lautwe boy was stand-

ing when the engine started to move; that the tender, twenty-one feet long, eleven feet high, and seven feet six inches wide, cuts off the view of the track for a distance much greater than that which intervened between the tender and the Lautwe boy. Other witnesses, one of whom, at least, was apparently disinterested, testified to making like experiments and with like results. According to this evidence, viewed in the light most favorable to plaintiff, a person standing on the track would have to be not closer to the rear end of the tender than seventy-five feet to be seen from the cab window under any circumstances.

It is conceded by plaintiff that this accident occurred at a [1] place where the Lautwe boy had no right to be. So far as he was concerned, the railway company was entitled to the exclusive use of the yards, and the enginemen had the right to assume that the track was clear. (*Palmer* v. *Oregon Short Line R. Co.*, 34 Utah, 466, 16 Ann. Cas. 229, 98 Pac. 689.) Actionable [2] negligence arises only from a breach of legal duty. (*Fusselman* v. *Yellowstone Valley L. & I. Co.*, 53 Mont. 254, Ann. Cas. 1918B, 420, 163 Pac. 473.) Under the doctrine of the last [3] clear chance, the duty to avoid injury arises only when the injured party is actually discovered in a position of peril, and apparently unconscious of his danger or unable to extricate himself, and the failure of the defendant to exercise reasonable care to avoid injuring him after such discovery constitutes the breach of duty. (20 R. C. L. 142.)

In *Dahmer* v. *Northern Pac. Ry. Co.*, 48 Mont. 152, 136 Pac. 1059, this court, speaking of the doctrine of the last clear chance, said: "A case calling for its application embodies three elements, *viz.*: (1) The exposed condition brought about by the negligence of plaintiff or the person injured; (2) the actual discovery by the defendant of the perilous situation of the person or property, in time to avert injury, and (3) the failure of defendant thereafter to use ordinary care to avert the injury. All of these elements must concur, else the rule has no application."

The plaintiff alleges in her complaint that the members of the [4] engine crew actually saw the boy in a position of imminent

peril. The allegation is denied in the answer, and the burden was upon the plaintiff to prove the facts alleged. This she might do by direct or circumstantial evidence. If the view from [5] the cab of the locomotive had been unobstructed, it might well be contended that there was sufficient circumstantial evidence to carry the case to the jury (*Doichinoff* v. *Chicago etc. Ry. Co.,* 51 Mont. 582, 154 Pac. 924) ; but in view of the fact, conceded by plaintiff, that the tender was between the train crew and the boy, she is compelled to rely upon her own statement that the engineer saw the boy, and upon certain admissions which it is claimed were made by the engineer and fireman at the coroner's inquest, as the only evidence proving or tending to prove that the engine crew actually saw the boy in his perilous situation.

The mother testified that at the inquest the engineer said: "When I looked behind, the boy was there. I went from fifteen to twenty feet from there;" but she was not able to state positively that the reference was to her boy. Other evidence given at the inquest discloses that the witnesses there testified about other boys who were present in the immediate vicinity at the time of the accident. This isolated statement, apart from the context, stands without explanation, and without any attempt to identify it with the person or time to which it relates. If the reference is to the Lautwe boy, and to the time when the mail clerk directed attention to the accident, or if the reference is to another boy mentioned in the testimony, it coincides substantially with the testimony given by the engineer on this trial. Standing alone, it cannot be said to prove, or tend to prove, that the engineer saw the Lautwe boy in a place of peril before the accident occurred.

A portion of an answer given by the fireman at the coroner's inquest was introduced by plaintiff on cross-examination of the fireman. The entire answer, introduced on recross-examination, discloses that his testimony before the coroner did not vary in any substantial particular from that given by him upon the trial.

56 Mont.—4

If plaintiff relied upon primary negligence of the engine crew, the evidence that the fireman was warned by the boys on the team track would be pertinent, but under the allegations of the complaint no duty to keep a lookout and discover the boy was imposed upon the trainmen. They are not charged with any negligence, except the failure to avoid injury after they actually discovered his perilous situation. It is alleged that the boy was a trespasser, and to avoid the imputation that his contributory negligence was the proximate cause of his injury it was necessary for plaintiff to allege further, as she did, that the enginemen actually discovered him in a position of imminent peril in time to avoid the injury. There is not any evidence that the fireman actually saw the boy on the track; on the contrary, the only evidence upon the subject is that he did not see him.

The rule prevails in this jurisdiction that, whenever the evidence is in such condition that if the case should be submitted [6] to the jury, and a verdict be returned for plaintiff, it would be the duty of the court to grant a new trial, the court may direct a verdict for defendant. (*Escallier* v. *Great Northern Ry. Co.,* 46 Mont. 238, Ann. Cas. 1914B, 468, 127 Pac. 458; *Bean* v. *Missoula Lumber Co.,* 40 Mont. 31, 104 Pac. 869.) The rule prevails generally. (38 Cyc. 1563–1565.)

The legal duty to grant a new trial arises whenever the evidence, in weight, does not justify the verdict. (*Hamilton* v. [7, 8] *Monidah Trust,* 39 Mont. 269, 102 Pac. 335.) The substance of these two rules is epitomized in our statute. Subdivision 5, section 6714, Revised Codes, provides that the court may dismiss an action or grant a nonsuit upon motion of defendant when upon the trial the plaintiff fails to prove a sufficient case for the "jury." Other subdivisions of the same section authorize the court to withdraw a case from the jury if the plaintiff fails to produce *any* evidence. Subdivision 5 must therefore refer to a case in which the plaintiff has tendered some evidence in support of the complaint, but the evidence is legally insufficient

[9]   to sustain a verdict, and this insufficiency may arise from the inherent weakness of the testimony itself.

In *Blankman* v. *Vallejo,* 15 Cal. 639, the court said: "We do not understand that the credulity of a court must necessarily correspond with the vigor and positiveness with which a witness swears.   A court may reject the most positive testimony, though the witness be not discredited by direct testimony impeaching him or contradicting his statements.   The inherent improbability of a statement may deny to it all claims to belief." That language was quoted with approval by this court in *Landsman* v. *Thompson,* 9 Mont. 182, 22 Pac. 1148, and in *Mattock* v. *Goughnour,* 11 Mont. 265, 28 Pac. 301.

"A witness can testify to those facts only which he knows of his own knowledge; that is, which are derived from his own perceptions, except in those few express cases in which his opinions or inferences, or the declarations of others, are admissible." (Rev. Codes, sec. 7862.)

The statement of the mother that the engineer "was looking at the boy, and the movements of the boy," must be considered in the light of the other evidence: That she was too far from the boy to call to him; too far to recognize her own son with his face turned partially from her, although she was present in the yards for the express purpose of looking for him; that the engineer was more than five hundred feet east from her, and eighty feet farther east from her than was the boy; that she took no account of the fact that the tender was between the engineer and the boy; that from the point where she stood to a point west of where the boy stood the track curves to the south, so that the boy was a considerable distance north of the direct line of vision between her and the engineer; that there was much noise and confusion at the time, occasioned by the incoming train and the movement of the switch engine; that the engineer testified that he did not see the boy; and that five witnesses, each of whom had made experiments, testified that on account of the position of the tender between the engineer and the boy it was impossible from the cab to see a person on the track where the Lautwe boy

was standing when the locomotive started. To these circumstances is to be added the fact that, in giving her evidence in chief, she said that the engineer "was looking toward the boy and should have seen the boy," and again that the engineer was "looking up toward me," and that it was not until she had been recalled to the stand for the fourth time, and after the defendants had completed their case, that she changed her testimony to the direct statement quoted above.

The trial court, with the evidence in this condition and with the added advantage of observing the demeanor of the witnesses on the stand, must have determined that it was impossible for the mother to know whether the engineer could see the boy; that at best the bald statement that he did see the boy was nothing more than the mere guess or conjecture of the witness, without any foundation more substantial than the fact that the engineer was looking in a westerly direction; and that if the case should be submitted to the jury and a verdict for plaintiff returned, it would be legally bound to grant a new trial for insufficiency of the evidence. In Moore on Facts, section 160, it is said: "Courts are not so deaf to the voice of nature or too blind to the laws of physics that every utterance of a witness in derogation of these laws will be treated as testimony of probative value because of its utterance. A court will treat that as unsaid by a witness which in the very nature of things could not be as said." (*Hook* v. *Missouri Pac. R. Co.*, 162 Mo. 569, 63 S. W. 366.)

While it is the rule that, upon motion for a directed verdict [10] in favor of defendant, the evidence offered by the plaintiff will be considered as proving every material fact which it tends to prove, still there must be substantial evidence to justify a verdict. Mere suspicions, conjectures, or speculations are not sufficient. (*Tudor* v. *Northern Pac. Ry. Co.*, 49 Mont. 456, 124 Pac. 276.)

Defendants' motion for a directed verdict was in effect a [11] demurrer to the evidence. It raised the question of the legal sufficiency of the evidence to establish the fact that the

members of the switch engine crew had actually seen the Lautwe
boy in a position of imminent peril, or, stated in different terms,
it presented to the trial court for determination the question:
Could the jury legitimately find from the evidence that any
member of the crew had actually seen the boy in his perilous
situation? By its ruling the court answered the inquiry in the
negative, and we are not prepared to say that the ruling was
erroneous.

In this view of the case, it is unnecessary to determine whether
the evidence is sufficient to show that the boy survived his in-
juries for an appreciable length of time.

Plaintiff offered to prove by a witness (Riordan) that in his
[12] opinion the engineer from his position in the cab could
see a person on the track nine feet from the west end of the
tender. Upon objection the offered evidence was excluded, and
we think correctly. The witness had not shown himself quali-
fied to give the opinion evidence solicited. Upon this specifica-
tion of error counsel for appellant contents himself with these
brief observations: "The offer of proof by the witness Riordan
that the engineer upon the engine, at the place and time in ques-
tion, was able to see within nine feet behind the west end of the
tender attached to the engine, should have been allowed."

The judgment entered in this case is in favor of all the
[13] defendants. The defendant Williams was not served
with summons and did not appear, and therefore there could
not have been any adjudication of the case as to him.

The order denying a new trial is affirmed. The cause is re-
manded to the district court, with directions to modify the judg-
ment by inserting after the word "defendants," wherever it
appears therein, the names of the defendants other than defend-
ant Williams, and, as thus modified, it will stand affirmed. Each
party will pay his costs of the appeal.

*Modified and affirmed.*

Mr. Chief Justice Brantly concurs.

Mr. Justice Cooper: I dissent. The accident out of which
this action arose occurred in the Northern Pacific yards, within

which are the passenger station, freight depot, and other buildings used by the defendant company, jointly with the Oregon Short Line Railway Company in the conduct of interstate traffic. On the north of the premises referred to is Front Street, a busy thoroughfare, which extends the length of the yards from east to west. If California Street were extended to the passenger station, the west line of the street would be about twenty feet east of where Fred Lautwe was struck. Main Street, at the western end of the block, runs clear through the yards and southward. All the yards and buildings are within the corporate limits of the city of Butte, and afford accommodation to such citizens of that city as desire to transact business with either of said transportation companies. It may be presumed that many people frequent the station platform and grounds on the arrival and departure of trains, some of whom are attracted there for the purpose of accompanying friends on their arrival at or departure from the station, and this doubtless added to the bustle, noise and confusion attending this tragedy, which took place immediately after the arrival of an Oregon Short Line train from the south.

It is undisputed that Fred Lautwe lost his life in the immediate vicinity of the platform of the station. The evidence tends to show that he was in the path of an incoming passenger train, but got out of its way, and was seen later standing on the track between the rails, or immediately south of the south rail, of the track on which the switch engine stood ready to do some switching. The length of time the boy was in that particular position is not disclosed. Very soon after the arrival of the Oregon Short Line passenger train, the crew proceeded with the switch engine to make up another train, and were backing, with the tender forward, pulling four coaches, when he was struck. The position in which the boy was standing when the switch engine started to back up is one of the debatable questions involved in this inquiry. Mrs. McIntyre, the mother and the plaintiff, says he was thirty feet from the tender. Mrs. Lee, a disinterested witness, does not venture an estimate as to the distance the boy

was from the engine.    The Shook boy says he was nine feet from the front of the tender when he first saw him; later, after measurements, he puts it at fifty-nine feet; and that was just at the time the Burgman boy shouted.    The lack of harmony in the fixing of the distance and the immediate happening there is doubtless due to the different positions from which the witnesses saw the tragedy.

At the close of the case, the court sustained a motion for an order directing a verdict in favor of defendants.    With all the facts proven which the evidence tends to prove was this correct?    Could the court rightfully say the evidence was legally insufficient to go to the jury, and to sustain a verdict for plaintiff, had one been found for her?    The crucial point in the case is whether or not the train crew actually saw the boy in imminent peril in time to avoid striking him.    If the evidence at the close of the case was in such condition that reasonable men might differ as to the conclusion to be drawn from the facts, circumstances and conditions, then the action of the court was error, and the case should have been submitted to the jury.    A brief summary of the testimony given by the witnesses, describing the position of the child and the actions of the train crew at the psychical moment, in my opinion, will disclose a conflict so substantial as to require determination thereof by the jury.

The mother of the boy, although some 625 feet from him, says he was twenty-five or thirty feet west of the end of the tender, in the center of the track on which the switch engine was backing, and that the engineer was looking at him.    Mrs. Lee states that she was going to work, and saw the boy sitting on the platform; the engine had not started, but the back of it was facing west, and she stopped and looked at the little fellow; and when the whistle blew the child picked up his wood, shoved his arm through the rope, and started down the track, "and I had just gotten—well, there was one more road to cross, and I heard some screaming on the Oregon Short Line coming in."    On cross-examination she said: "I noticed this little fellow sitting and looking at the engine, and as the whistle blew he got up and

stuck his arm through this wood and started down. The engine hadn't moved yet, because I crossed back on and went down. * * * He had gotten up before I got to him and started down the track; he had crossed the engine and went on down the track. He didn't go around the engine. I did not see him cross the track the switch engine was on. *The last time I saw him he was walking west on the south side of the track on which the switch engine was.*" Ralph Shook saw him in front of the engine just before he was struck.

On the trial the engineer testified: That he moved down with the engine until the tender was halfway over the end of the platform, and then waited for No. 1 to pull in; that that afternoon, five or ten minutes before the accident occurred, he saw Fred Lautwe coming down the platform with an armful of wood and went over back of the cars that were over on the house track; passed west of the tender of the switch engine and disappeared on the north side of the cars; next saw him after decapitation by the drive wheel No. 2 of his engine, which was probably thirty feet from the footboard of the engine, which first struck the boy. After the arrival of the passenger train, the switchman said, " 'There is the whistle,' and with that I got up, *and came around the back end of the engine, and got up on to the engine, and I looked down the track* and got my signal, asked the fireman how everything was," got his signal, started the bell, and blew the whistle; "the fireman said 'O. K.,' and it was the same on my side, with the exception of one little lad about five or six running from the track that the train was pulling in on to mine; *whether he would get caught by the train coming in or mine, or whether he would miss both of us, I didn't know.* I kept an eye on him for pretty near the car-length I did move. The little boy was west of the platform, and between the track my engine was on and the main track. Then, after I had gone about a car-length, he ran up into the crowd and I shut the bell-ringer off. There was nothing in sight." He stated that the track he was on curved to the left as he looked out of his cab window facing west, and that one could see further looking

across the short arc of the curve than he could on a tangent. He stated that he did not testify at the coroner's inquest that he saw this boy back of the tender. "The only time I saw this boy was about *five minutes before this,* and that is what I testified to at the coroner's inquest."

Switchman Finnegan likewise testified to seeing a small boy with wood; that he saw Fred Lautwe, a short time before the accident, coming down the platform toward the depot; that he passed him "and went westward; I didn't know whether he went south or north; after that my attention was up the other way, the passengers getting on the Short Line that we were going to handle"; next saw the boy after the accident; later recognized him as the boy with the wood; "saw nobody on the track westerly; nobody on the track at all; there was a child running down that way, running back and forth, a small boy, that is, down on the tracks, *the main line and the boot track.* I could not say where the child went. I saw him pass where he was out of danger of the engine, and then I looked back the other way again." There was nothing to obstruct the view. The fireman testified that he did not see the boy at any time after getting up in his cab window, but heard the Burgman boy hollo, just before the collision; the engine was moving at the rate of two or three miles an hour; "after they holloed we ran fifteen feet." Switchman Hurd testified that he looked in the direction he expected the engine to come from. Walter Burgman, a boy, also testified to seeing the boy "stepping from the main line to the line upon which the switch engine was" just as he was struck. He was the boy that holloed; that he was hit in the back. The Shook boy was recalled, and, basing his testimony on measurements long after the happening of the accident, stated that Fred Lautwe was standing fifty-nine feet from the tender of the engine and about sixty-nine feet from the west end of the platform.

The direct testimony of Mrs. McIntyre and of Mrs. Lee as to seeing the boy on the track in front of the backing engine is not disputed, except inferentially by the engineer, and Switchman

Finnegan. The fireman did not say he never saw the boy, but that he did not see him after he got up into the cab of the engine. Would it be violent to indulge the presumption that he saw him before he got into the cab? Would it not be a just inference to draw from the engineer's testimony that he did see Fred Lautwe when he went around his engine and before he got into the cab, considering the conditions then existing there? Could the court say, as matter of law, that the boy was not seen by the engineer, in face of the direct statements of Mrs. McIntyre and Mrs. Lee that they saw the boy at what must have been the precise time when the engineer looked up the track immediately before starting? Was it within the province of the court below to say, as matter of law, that neither the engineer nor Switchman Finnegan saw Fred Lautwe before getting on the engine in the manner described by them? Is it at all material how wide the engine or the tender was, or how much it obstructed the view, if they both looked up the track, when they were upon the ground and saw the boy in a perilous situation, immediately before starting back? The boy is placed by Mrs. McIntyre, by Mrs. Lee and by the Shook and Burgman boys, directly in front of the engine; yet the engineer says he did not see him when, if he had used his eyes, he could not have failed to do so. The same is true of Switchman Finnegan. No other boy than Fred Lautwe was seen with an armful of wood, as far as the evidence discloses, and Mrs. Lee says he had wood in his arms.

Would an ordinarily prudent engineer start an engine backward, with the view obscured for 102 feet, in the immediate vicinity of a passenger depot and platform, and under all the conditions presented here? Boys were all around them at the moment, for they testify that they were. With this combination of direct and circumstantial testimony concerning the movements of the boy, could any court say as matter of law that Fred Lautwe, whose mangled body was later discovered thirty feet from where the engine first struck him, was not on the track in front of the backing switch engine, when the engineer walked around his engine and looked up the track west-

ward? Upon what hypothesis did the court rest its decision? How is it possible that the engineer and switchman did not see the boy, in view of the direct testimony of the two women, and the actual positive fact that he was caught in the maw of the backing engine and found later thirty feet from the footboard of the engine which first struck him—the drivewheel having severed his head from his body? This, too, in broad daylight, the train crew fully aware of the presence of boys, as the testimony shows. Will categorical denials make that a matter of law which would otherwise be a question of fact? (See *Landsman* v. *Thompson,* 9 Mont. 182, 22 Pac. 1148; *Mattock* v. *Goughnour,* 11 Mont. 265, 28 Pac. 301; *Blankman* v. *Vallejo,* 15 Cal. 639.) Can uncontroverted, direct and positive statements be outweighed by a barrage of denials, and justify the action of the court in granting a peremptory command to the jury to find a verdict for defendant? The result is an argument against it.

The supreme court of Alabama, in *Shelton's Case,* 136 Ala. 191, 34 South. 194, through Chief Justice McClellan, said: ''The important question yet remains: Did the engineer or fireman actually see him [deceased] in this perilous position? Or, rather, does the evidence we have detailed afford the basis for an inference by the jury that one or both of them did in fact see him in such position? Both of them testified that they did not see him or anybody on the track at that time and place. But might not the jury find to the contrary notwithstanding? We think so. The jury were not bound to believe or disbelieve the testimony of these witnesses in its entirety. They could believe that they were looking ahead at the time, and that they could have seen a man on the track and disbelieve their statements that they did not see anyone on the track. And the conclusion on the evidential tendencies under consideration would be drawn thus: Shelton was in a position of manifest peril on the track in front of the engine. He was in view of the engine. They were looking along the track where he was. Therefore they must have seen him, and this though they testify that they did not.''

If the humanitarian doctrine, or the last clear chance to avert injury, first invoked by an English court in 1842, compensating the owner of a donkey standing in the middle of the road, shackled and run into and injured in broad daylight by a reckless driver is ever to be applied, why should it not attach with all its force to a case giving rise to the taking of human life under the conditions presented here?

That the age of the boy, the capacity for understanding and appreciation of the position in which he then was, and all the surrounding conditions are to be considered in a case like this, is not open to question. "Where there is reason to apprehend that the track may not be clear, as in the case of tracks running through cities or other populous districts, where persons are in the habit of crossing or walking on the tracks, the persons operating the trains cannot act on the presumption that the track is clear, and so fail to maintain a proper lookout without making the company responsible for the consequences. Especially is this true, according to some authorities, where the trespassers are children, or where there is such a custom established on the part of the public of going up the tracks as to amount to a license. In such cases a failure to see is not alone sufficient, but there must be a failure to see after the exercise of ordinary care." (23 Am. & Eng. Ency. of Law, 754.) See, also, 8 Thompson on Negligence (White's Supplement), section 1726, and cases cited. In section 1725 Mr. Thompson says: "And for the purpose of this rule it makes no difference that the railroad company has posted signboards warning people not to trespass on the right of way." In populous communities, foot-passengers may, from long habit of use known to and suffered by the company, be expected at all times and in any number upon the right of way. The company should no more shut its eyes to such a probability than to the actual fact of presence when known.

In *Northern Alabama Ry. Co.* v. *Guttery,* 189 Ala. 614, 66 South. 583, it is said: "The engineer testified that, according to orders, he was *looking ahead* on this occasion along the track for a train that usually preceded his through the Jasper railroad

yard.   Certainly it cannot be affirmed *as a matter of law* that in observing this duty his *purpose* in looking ahead confined or restricted his vision.   If this engineer was looking ahead, and saw intestate in a position of peril ahead of his moving engine, and so far removed as to allow opportunity, skillfully availed of, to avert injury to him, it was, according to repeated deliverances here, a question for the jury to determine whether his omission to act as duty required was, at the time, characterized by those elements of wrongful purpose or wanton indifference to which the law attributes the most aggravated wrong—that declared on in the fifth count as amended.   *   *   *   Here there was evidence upon which the jury could predicate a finding that the lookout was along the track at the place where Guttery was killed—a lookout not qualified by the then performance of other duties that took the view of the operative away from this section of the track.''   (*Bush's Case,* 122 Ala. 470, 26 South. 168; *Hyde's Case,* 164 Ala. 162, 51 South. 368; *Central of Georgia Ry. Case,* 178 Ala. 651, 59 South. 507.   See, also, *North Pennsylvania Ry.* v. *Mahoney,* 57 Pa. 187; *Johnston* v. *Atchison, T. & S. F. Ry. Co.,* 56 Kan. 264, 43 Pac. 228; *Alabama Great Southern R. Co.* v. *Guest,* 136 Ala. 348, 34 South. 968; *Lake Shore & M. S. Ry. Co.* v. *Bodemer,* 139 Ill. 605, 32 Am. St. Rep. 218, 29 N. E. 692.)   In the case last cited, Chief Justice Magruder, of the supreme court of Illinois, uses this language: ''If the boy was 125 feet from the engine when he stepped upon the track, did the engineer see him?   It was for the jury to answer this question.   The company did not produce the engineer to say that he did not see the deceased, nor did it introduce any evidence upon that subject.   It is not necessary to show by affirmative testimony that the engineer's look was directed toward the boy.   It is sufficient if it appear from all the circumstances that he might have seen him by the exercise of reasonable diligence and ordinary prudence.   Why did he not see him?   The track was straight and clear and unobstructed for a long distance.   Others saw him.''

In *Battishill* v. *Humphreys*, 64 Mich., on page 521 [38 N. W. 586], the court remarks: ''What others saw in looking along the track, these employees could have seen; and that they did not observe the child under the circumstances shows them guilty of reckless negligence.'' The doctrine has been recognized by this court on several occasions. (*Dahmer* v. *Northern Pac. Ry. Co.*, 48 Mont., on page 163, 136 Pac. 1059, 142 Pac. 209; *Doichinoff* v. *Chicago etc. Ry. Co.*, 51 Mont. 582, 154 Pac. 924.)

A child is responsible for the degree of care, and that only, which could reasonably be expected of him, considering his age, capacity, and experience. The weight of authority is to the effect that it is a question for the jury to determine the responsibility or irresponsibility of a child. (Shearman & Redfield on Negligence, 6th ed., sec. 73a. See, also, *Huggett* v. *Erb,* 182 Mich. 524, Ann. Cas. 1916B, 352, 148 N. W. 805; Elliott on Railroads, sec. 1253.)

''Upon the question whether the engineer, after discovering the boy's peril, exercised ordinary care to avoid striking him, the evidence is conflicting, and with the jury's determination we cannot interfere. The question had to be determined by a consideration of the personnel of the witnesses, their apparent interest in the controversy, their qualifications to give expert or opinion evidence, and other matters, all properly cognizable under the generic term 'credibility.' '' (*Melzner* v. *Northern Pac. Ry. Co.*, 46 Mont. 162, 127 Pac. 151.)

''The responsibility of railroads for injuries to persons by trains, can very seldom, if ever, be determined on pure questions of law. Negligence depends too much on the circumstances of the transaction complained .of, to be capable of any absolute definition by special facts. In order to create liability, something must have been brought about which would not probably have happened if the party complained of had not failed to use the care and precaution which it was wrong not to use under the circumstances. But in considering this all the circumstances must be regarded. They cannot be taken up one by one, and the act. be pronounced right or wrong in view of any one of

them isolated from the rest." (*Marcott* v. *Marquette, H. & O. R. Co.;* 47 Mich. 1, 5, 10 N. W. 53, 54.)

The statement of the engineer that Fred Lautwe passed west of the tender and disappeared north is in direct conflict with the testimony of both Mrs. McIntyre and Mrs. Lee, and this, in the view I take of the testimony, presented a clear case of fact for determination by the jury.