## PRESTON *v.* PRATHER.

ERROR TO THE CIRCUIT COURT OF THE UNITED STATES FOR THE NORTHERN DISTRICT OF ILLINOIS.

No. 115. Argued December 11, 1890. — Decided January 5, 1891.

When a case is heard, on stipulation of the parties, by the court without the intervention of a jury, and its special findings cover all the disputed questions of fact, and there is in the record no bill of exceptions taken to rulings in the progress of the trial, the correctness of the findings on the evidence is not open for consideration here.

Gratuitous bailees of another's property are not responsible for its loss unless guilty of gross negligence in its keeping; and whether that neg-

ligence existed is a question of fact for the jury to determine; or to be determined by the court where a jury is waived.

The reasonable care which a bailee of another's property entrusted to him for safe keeping without reward must take, varies with the nature, value and situation of the property and the bearing of surrounding circumstances on its security.

Persons depositing valuable articles with banks for safe-keeping without reward have a right to expect that such measures will be taken as will ordinarily secure them from burglars outside and from thieves within; that whenever ground for suspicion arises an examination will be made to see that they have not been abstracted or tampered with; that competent men, both as to ability and integrity, for the discharge of these duties will be employed; and that they will be removed whenever found wanting in either of these particulars.

In this case persons engaged in business as bankers received for safe-keeping a parcel containing bonds, which was put in their vaults. They were notified that their assistant cashier, who had free access to the vaults where the bonds were deposited, and who was a person of scant means, was engaged in speculations in stocks. They made no examination as to the securities deposited with them, and did not remove the cashier. He stole the bonds so deposited. *Held*, that the bankers were guilty of gross negligence, and were liable to the owner of the bonds for their value at the time they were stolen.

When bonds originally deposited with a bank for safe-keeping are by agreement of the bailor and bailee made a standing security for the payment of loans to be made by the bank to the owner of the bonds, the bailee becomes bound to give such care to them as a prudent owner would extend to his own property of a similar kind.

THE plaintiffs below, the defendants in error here, were citizens of Missouri, and for many years · have been copartners, doing business at Maryville, in that State, under the name of the Nodaway Valley Bank of Maryville. The defendants below were citizens of different States, one of them of Michigan and the others of Illinois, and for a similar period have been engaged in business as bankers at Chicago, in the latter State. In 1873 the plaintiffs opened an account with the defendants, which continued until the spring of 1883. The average amount of deposits by them with the defendants each year during this period was between two and four hundred thousand dollars. Interest was allowed at the rate of two and one-half per cent on the deposits above three thousand dollars, but nothing on deposits under that sum.

On the 7th of July, 1880, the plaintiffs purchased of the

defendants four per cent bonds of the United States to the nominal amount of twelve thousand dollars; but, the bonds being at a premium in the market, the plaintiffs paid for them, including the accrued interest thereon, thirteen thousand and five dollars. The purchase was made upon a request by letter from the plaintiffs; and all subsequent communications between the parties respecting the bonds, and the conditions upon which they were to be held, are contained in their correspondence. The letter directing the purchase concluded with a request that the defendants send to the plaintiffs a description and the numbers of the bonds, and hold the same as a special deposit. In the subsequent account of the purchase rendered by the defendants the plaintiffs were informed that the bonds were held on special deposit subject to their order. The numbers of the bonds appear upon the bond register kept by the defendants, and the bonds remained in their custody until some time between November, 1881, and November, 1882, when they were stolen and disposed of by their assistant cashier, one Ker, who absconded from the State on the 16th of January, 1883. The present action was brought to recover their value.

[It appeared that about a year before he absconded, information was given to the bank that some one in its employ was speculating on the Board of Trade in Chicago, and an inquiry revealed the fact that Ker was that person. Although he was supposed to be dependent entirely on his salary, and although he had free access to the vaults where the securities of the bank, including these bonds, were deposited, he was continued in the service of the bank until the theft took place.

At the trial a jury was waived by stipulation. The court found special findings of fact, which were not excepted to, and gave judgment for the plaintiffs. 29 Fed. Rep. 498. The defendants sued out this writ of error.]

*Mr. John P. Wilson* for plaintiffs in error, with whom was *Mr. P. S. Grosscup* for Kean, one of the plaintiffs in error.

I. The stolen bonds were held as a special deposit at the date when they were stolen. *Reynes* v. *Dumont*, 130 U. S.

354; *Duncan* v. *Brennan*, 83 N. Y. 487; *Wyckoff* v. *Anthony*, 90 N. Y. 442; *Neponset Bank* v. *Leland*, 5 Met. 259.

II. The bonds being held on special deposit, plaintiffs in error would be liable for their loss only in the event of such loss being caused by their gross negligence, which is not established by the facts found by the court. *Foster* v. *Essex Bank*, 17 Mass. 479; *S. C.* 9 Am. Dec. 168; *Giblin* v. *McMullen*, L. R. 2 P. C. 317; *Whitney* v. *National Bank of Brattleboro*, 55 Vermont, 154; *Allentown Bank* v. *Rex*, 89 Penn. St. 308; *Tompkins* v. *Saltmarsh*, 14 S. & R. 275; *National Bank* v. *Graham*, 100 U. S. 699.

III. The facts found by the court are insufficient to sustain the judgment, even if the bonds were held under an agreement that the same should be collateral for overdrafts. *Smith* v. *First National Bank*, 99 Mass. 605; *S. C.* 97 Am. Dec. 59; *Allentown Bank* v. *Rex*, 89 Penn. St. 308; *Scott* v. *National Bank of Chester Valley*, 72 Penn. St. 471.

*Mr. W. P. Fennell* and *Mr. M. D. Brainard* also filed a brief for Gray, plaintiff in error.

*Mr. Huntington W. Jackson* for defendants in error.

*Mr. Robert Hervey* also filed a brief for defendants in error.

Mr. Justice Field, after stating the case, delivered the opinion of the court.

By the defendants it was contended below in substance, and the contention is renewed here, that the bonds being placed with them on special deposit for safe-keeping, without any reward, promised or implied, they were gratuitous bailees, and were not chargeable for the loss of the bonds, unless the same resulted from their gross negligence, and they deny that any such negligence is imputable to them.

On the other hand, the plaintiffs contended below, and repeat their contention here, that, assuming that the defendants were in fact simply gratuitous bailees when the bonds were deposited with them, they still neglected to keep them with the care which such bailees are bound to give for the protec-

tion of property placed in their custody; and further, that subsequently the character of the bailment was changed to one for the mutual benefit of the parties.

Much of the argument of counsel before the court, and in the briefs filed by them, was unnecessary — indeed, was not open to consideration — from the fact that the case was heard, upon stipulation of parties, by the court without the intervention of a jury, and its special findings cover all the disputed questions of fact. There is in the record no bill of exceptions taken to rulings in the progress of the trial, and the correctness of the findings upon the evidence is not open to our consideration. Rev. Stat. § 700. The question whether the facts found are sufficient to support the judgment is the only one of inquiry here.

Undoubtedly, if the bonds were received by the defendants for safe-keeping, without compensation to them in any form, but exclusively for the benefit of the plaintiffs, the only obligation resting upon them was to exercise over the bonds such reasonable care as men of common prudence would usually bestow for the protection of their own property of a similar character. No one taking upon himself a duty for another without consideration is bound, either in law or morals, to do more than a man of that character would do generally for himself under like conditions. The exercise of reasonable care is in all such cases the dictate of good faith. An utter disregard of the property of the bailor would be an act of bad faith to him. But what will constitute such reasonable care will vary with the nature, value and situation of the property, the general protection afforded by the police of the community against violence and crime, and the bearing of surrounding circumstances upon its security. The care usually and generally deemed necessary in the community for the security of similar property, under like conditions, would be required of the bailee in such cases, but nothing more. The general doctrine, as stated by text writers and in judicial decisions, is that gratuitous bailees of another's property are not responsible for its loss unless guilty of gross negligence in its keeping. But gross negligence in such cases is nothing

more than a failure to bestow the care which the property in its situation demands; the omission of the reasonable care required is the negligence which creates the liability; and whether this existed is a question of fact for the jury to determine, or by the court where a jury is waived. See *Steamboat New World* v. *King*, 16 How. 469, 474, 475; *Railroad Co.* v. *Lockwood*, 17 Wall. 357, 383; *Milwaukee & St. Paul Railway* v. *Arms*, 91 U. S. 489, 494. The doctrine of exemption from liability in such cases was at one time carried so far as to shield the bailees from the fraudulent acts of their own employés and officers, though their employment embraced a supervision of the property, such acts not being deemed within the scope of their employment.

Thus, in *Foster* v. *Essex Bank*, 17 Mass. 479, the bank was, in such a case, exonerated from liability for the property entrusted to it, which had been fraudulently appropriated by its cashier, the Supreme Judicial Court of Massachusetts holding that he had acted without the scope of his authority, and, therefore, the bank was not liable for his acts any more than it would have been for the acts of a mere stranger. In that case a chest containing a quantity of gold coin, which was specified in an accompanying memorandum, was deposited in the bank for safe-keeping, and the gold was fraudulently taken out by the cashier of the bank and used. It was held, upon the doctrine stated, that the bank was not liable to the depositor for the value of the gold taken.

In the subsequent case of *Smith* v. *First National Bank in Westfield*, 99 Mass. 605, 611, the same court held that the gross carelessness which would charge a gratuitous bailee for the loss of property must be such as would affect its safe-keeping, or tend to its loss, implying that liability would attach to the bailee in such cases, and to that extent qualifying the previous decision.

In *Scott* v. *National Bank of Chester Valley*, 72 Penn. St. 471, 480, the Supreme Court of Pennsylvania asserted the same doctrine as that in the Massachusetts case, holding that a bank, as a mere depositary, without special contract or reward, was not liable for the loss of a government bond depos-

ited with it for safe-keeping, and afterwards stolen by one of
its clerks or tellers. In that case it was stated that the teller
was suffered to remain in the employment of the bank after it
was known that he had dealt once or twice in stocks, but this
fact was not allowed to control the decision, on the ground
that it was unknown to the officers of the bank that the teller
gambled in stocks until after he had absconded, but at the
same time observing that:

" No officer in a bank, engaged in stock gambling, can be
safely trusted, and the evidence of this is found in the numer-
ous defaulters, whose peculations have been discovered to be
directly traceable to this species of gambling. A cashier,
treasurer, or other officer having the custody of funds, thinks
he sees a desirable speculation, and takes the funds of his insti-
tution, hoping to return them instantly, but he fails in his
venture, or success tempts him on; and he ventures again to
retrieve his loss, or increase his gain, and again and again he
ventures. Thus the first step, often taken without a criminal
intent, is the fatal step, which ends in ruin to himself and to
those whose confidence he has betrayed."

As stated above, the reasonable care which persons should
take of property entrusted to them for safe-keeping without
reward will necessarily vary with its nature, value and situa-
tion, and the bearing of surrounding circumstances upon its
security. The business of the bailee will necessarily have some
effect upon the nature of the care required of him, as, for ex-
ample, in the case of bankers and banking institutions, having
special arrangements, by vaults and other guards, to protect
property in their custody. Persons therefore depositing val-
uable articles with them, expect that such measures will be
taken as will ordinarily secure the property from burglars out-
side and from thieves within, and that whenever ground for
suspicion arises an examination will be made by them to see
that it has not been abstracted or tampered with; and also
that they will employ fit men, both in ability and integrity,
for the discharge of their duties, and remove those employed
whenever found wanting in either of these particulars. An
omission of such measures would in most cases be deemed cul-

pable negligence, so gross as to amount to a breach of good faith, and constitute a fraud upon the depositor.

It was this view of the duty of the defendants in this case, who were engaged in business as bankers, and the evidence of their neglect, upon being notified of the speculations in stocks of their assistant cashier who stole the bonds, to make the necessary examination respecting the securities deposited with them, or to remove the speculating cashier, which led the court to its conclusion that they were guilty of gross negligence. It was shown that about a year before the assistant cashier absconded the defendant Kean, who was the chief officer of the banking institution, was informed that there was some one in the bank speculating on the Board of Trade at Chicago. Thereupon Kean made a quiet investigation, and the facts discovered by him pointed to Ker, whom he accused of speculating. Ker replied that he had made a few transactions, but was doing nothing then and did not propose to do anything more, and that he was then about a thousand dollars ahead, all told. It was not known that Ker had any other property besides his salary. His position as assistant cashier gave him access to the funds as well as the securities of the bank, and he was afterwards kept in his position without any effort being made on the part of the defendants to verify the truth of his statement, or whether he had attempted to appropriate to his own use the property of others.

Again, about two months before Ker absconded, one of the defendants, residing at Detroit, received an anonymous communication, stating that some one connected with the bank in Chicago was speculating on the Board of Trade. He thereupon wrote to the bank, calling attention to the reported speculation of some of its employés, and suggesting inquiry and a careful examination of its securities of all kinds. On receipt of this communication Kean told Ker what he had heard, and asked if he had again been speculating on the Board of Trade. Ker replied that he had made some deals for friends in Canada, but the transactions were ended. The defendants then entered upon an examination of their books and securities, but made no effort to ascertain whether the special depos-

its had been disturbed. Upon this subject the court below, in giving its decision, *Prather* v. *Kean*, 29 Fed. Rep. 498, after observing that the defendants knew that Ker had been engaged in business which was hazardous and that his means were scant, and after commenting upon the demoralizing effect of speculating in stocks and grain, as seen in the numerous peculations, embezzlements, forgeries and thefts plainly traceable to that cause, and the free access by Ker to valuable securities, which were transferable by delivery, easily abstracted and converted, and yet his being allowed to retain his position without any effort to see that he had not converted to his own use the property of others, or that his statements were correct, held that it was gross negligence in the defendants not to discharge him or place him in some position of less responsibility. In this conclusion we fully concur.

The second position of the plaintiffs is also well taken, that, assuming the defendants were gratuitous bailees at the time the bonds were placed with them, the character of the bailment was subsequently changed to one for the mutual benefit of the parties. It appears from the findings that the plaintiffs, subsequently to their deposit, had repeatedly asked for a discount of their notes by the defendants, offering the latter the bonds deposited with them as collateral, and that such discounts were made. When the notes thus secured were paid, and the defendants called upon the plaintiffs to know what they should do with the bonds, they were informed that they were to hold them for the plaintiffs' use as previously. The plaintiffs had already written to the defendants that they desired to keep the bonds for an emergency, and also that they wished at times to overdraw their account, and that they would consider the bonds as security for such overdrafts. From these facts the court was of opinion that the bonds were held by the defendants as collateral to meet any sums which the plaintiffs might overdraw; and the accounts show that they did subsequently overdraw in numerous instances.

The deposit, by its change from a gratuitous bailment to a security for loans, became a bailment for the mutual benefit of both parties, that is to say, both were interested in the

transactions. For the bailor it obtained the loans, and to that extent was to his advantage; and to the bailee it secured the payment of the loans, and that was to his advantage also. The bailee was therefore required, for the protection of the bonds, to give such care as a prudent owner would extend to his own property of a similar kind, being in that respect under an obligation of a more stringent character than that of a gratuitous bailee, but differing from him in that he thereby became liable for the loss of the property. if caused by his neglect, though not amounting to gross negligence.

Two cases cited by counsel, one from the Court of Appeals of Maryland and the other from the Court of Appeals of New York, declare and illustrate the relation of parties under conditions similar to those of the parties before us.

In the case from Maryland, *Third National Bank* v. *Boyd,* 44 Maryland, 47, it appeared that a firm by the name of William A. Boyd & Co. was a large customer of the Third National Bank of Baltimore, and on the 5th of February, 1866, was indebted to it in about $5000. Subsequently, the senior member of the firm, pursuant to an agreement between him and the president of the bank, deposited with the bank certain bonds and stocks as collateral security for the payment of all obligations of himself and of the firm then existing or that might be incurred thereafter, with the understanding that the right to sell the collaterals in satisfaction of such obligations was vested in the officers of the bank. Some of the bonds were subsequently withdrawn and others deposited in their place. While these collaterals were with the bank the firm kept a deposit account, having an average of about $4000, and from time to time, as it needed, obtained on the security of the collaterals discounts ranging from three to fifteen thousand dollars. The firm was not indebted to the bank subsequently to July, 1872, when it paid its last indebtedness; the bonds, however, were not then withdrawn, but left in the bank under the original agreement. In August, 1872, the bank was entered by burglars and certain of the bonds were stolen. In an action by the senior partner against the bank to recover the value of the bonds stolen, it was held: "First.

That the contract entered into by the bank was not a mere gratuitous bailment. . . . Third. That the original contract of bailment being valid, and binding, the obligation of the bank for the safe custody of the deposit did not cease when the plaintiff's debt had been paid. Fourth. That the defendant was responsible if the bonds were stolen in consequence of its failure to exercise such care and diligence in their custody and keeping as, at the time, banks of common prudence in like situation and business usually bestowed in the custody and keeping of similar property belonging to themselves; that the care and diligence ought to have been such as was properly adapted to the preservation and protection of the property, and should have been proportioned to the consequence likely to arise from any improvidence on the part of the defendant. Fifth. That the proper measure of damages was the market value of the bonds at the time they were stolen. Whether due care and diligence have been exercised by a bank in the custody of bonds deposited with it as collateral security, is a question of fact exclusively within the province of the jury to decide."

In the case from New York, *Cutting* v. *Marlor*, 78 N. Y. 454, it appeared that the defendant, as collateral security for a loan made to him by a bank, delivered to it certain securities, which were taken and converted by the president to his own use. In an action by the receiver of the bank to recover the amount loaned it was found that the trustees of the bank left the entire management of its business with the president and an assistant, styled manager; that they received the statements of the president without question or examination; that they had no meetings pursuant to the by-laws, and made no examination of the securities, and exercised no care or diligence in regard to them; also, that the president had been in the habit of abstracting securities and using them in his private business, most of them being returned when called for; and that the manager, who had knowledge of this habit, did not take any means to prevent it, nor did he notify the trustees. It was held that the bank was chargeable with negligence, and that the defendant was entitled to counter-

claim the value of the securities; that the bailment was for the mutual benefit of the parties; that the bailee was bound, for the protection of the property, to exercise ordinary care, and was liable for negligence affecting the safety of the collaterals, distinguishing the case from the liability of a gratuitous bailee, which arises only where there has been gross negligence on his part.

It follows, therefore, that whether we regard the defendants as gratuitous bailees in the first instance, or as afterwards becoming bailees for the mutual benefit of both parties, they were liable for the loss of the bonds deposited with them. And the measure of the recovery was the value of the bonds at the time they were stolen.

*Judgment affirmed.*