STOCKMEN'S NAT. BANK OF CASPER v.
RICHARDSON.
(No. 1779; Jan. 31, 1933; 18 Pac. (2d) 635)

For plaintiff in error, there was a brief and oral argument by *R. R. Rose* and *Robert N. Ogden, Jr.,* of Casper, Wyoming.

For the defendant in error, there was a brief and oral argument by *Fred W. Layman,* of Casper, Wyoming.

RINER, Justice.

This case is here by proceedings in error to review a judgment of the District Court of Natrona County. The defendant in error, Columbus Wardlaw, having died before the case was argued in this court, F. L. Richardson, as executor of the last will of the deceased, was substituted in his stead upon stipulation and order made pursuant thereto.

The facts upon which this litigation arose, as disclosed by the record, are briefly these: On June 12, 1922, Wardlaw held a mortgage on certain real property located in the city of Casper, Wyoming, and owned by one J. F. Blodgett, a resident of that place, the instrument being given to secure a promissory note for $750. Previously, Wardlaw had been advised by Blodgett that he desired to borrow some money from the Casper Mutual Building & Loan Association and, as the latter declined to take a second mortgage, it was arranged between Wardlaw and Blodgett that the former, who then lived in the State of Oregon, should send the note

and mortgage aforesaid, with a release thereof, to Casper, Wyoming, where Blodgett agreed to pay at least $250 on account of the principal of the note; the release of the Wardlaw mortgage was to be placed of record, the Casper Mutual Building & Loan Association was to have a first mortgage lien on the property named and a new note for the balance due after Blodgett's payment, was to be taken in Wardlaw's favor secured by another mortgage which was to be placed of record and be subordinate only to the lien given the Loan Association.

Accordingly, on the date above mentioned, Wardlaw wrote to the Stockmen's National Bank of Casper, the plaintiff in error, a corporation doing a banking business in that city, one of whose customers Blodgett was, the following letter:

"At the request of Rev. J. F. Blodgett I am sending you a mortgage, note and release. He is to take this up by paying $250.00 (or more if he wills) and executing a new note and mortgage for the unpaid balance. The mortgage to cover the same property. He pays the expenses. Have mortgage recorded and send to me. Also send me the new note with your cashiers check for the amount paid you."

On July 31, 1922, the bank sent Wardlaw another form of release of his original mortgage stating that the one he had sent was improperly executed and also advising him that the new papers were then "all made out" and that they would forward him a payment of $250. Wardlaw re-executed and returned the release, which was recorded on August 24, 1922, the same day the new mortgage to the Loan Association was placed of record. On August 30 following, the bank again wrote Wardlaw transmitting to him its draft for $250.86 as Blodgett's payment on the note and stating also, "As Mr. Blodgett is out of town we are forwarding the draft to you and holding the other papers until he returns, immediately after which they will be forwarded to you."

There was also offered and received in evidence on the trial of the case, a letter purporting to have been written to Wardlaw by the cashier of the bank under date of September 11, 1922, advising him of several ineffectual attempts to obtain the filing fee from Blodgett for Wardlaw's new mortgage and that Blodgett had that morning told the cashier that he did not have the money, but would bring it in in a few days. The concluding paragraph of this letter reads:

"Would suggest that to be on the safe side you send us $2.50 to record the mortgage and in the event we can collect later from Blodgett we will return same to you."

This communication, the cashier of the bank testified, was "mailed to Wardlaw by ordinary mail" properly addressed and stamped.

Thereafter and on October 1, 1922, Blodgett and his wife gave a mortgage on the property aforesaid to the O. L. Walker Lumber Company, which was duly recorded October 25, 1922, having previously and on September 9, 1922, given another mortgage to one C. E. Hillis, which was recorded on November 13, 1922.

No other communications appear to have passed between the bank and Wardlaw until November 3, 1922, when the latter wrote the bank:

"What has become of the J. F. Blodgett note and mortgage for $850.00 in my favor? I have not heard from you in weeks. See that the mortgage is recorded and the note and mortgage sent to me."

To this communication, on November 17 following, the bank by its cashier responded:

"Replying to your letter of the 3d, I beg to advise you that the Blodgett mortgage is now ready to be filed and if you will remit us $2.50 we will attend to the same and return it to you together with the note."

Wardlaw, immediately upon receipt of this letter, sent the $2.50 filing fee requested and the mortgage executed by Blodgett and his wife July 31, 1922 was finally recorded December 4, 1922.

Wardlaw did not learn of the existence of the Lumber Company and Hillis mortgages until the year 1927 when the former began foreclosure proceedings and all mortgagees interested in the property were made parties. In that litigation, the Casper Mutual Building & Loan Association mortgage was decreed as a first lien for $7989.97, the O. L. Walker Lumber Company mortgage as a second lien for $4700.40, the C. E. Hillis mortgage as a third lien for $1275.00, and the Wardlaw mortgage as a fourth lien for $1435.67, for which last mentioned amount Wardlaw was given a judgment against the Blodgetts. The property was formally appraised at $10,000 and ultimately sold for $12,720.37. Wardlaw was financially situated to take up the Loan Association first mortgage if his mortgage had been recorded so as to be subordinate to that lien only. A search of the county records of Natrona County disclosed that Blodgett and his wife owned no other property in the county, either real or personal.

Wardlaw instituted suit against the bank to recover the damage claimed by him to have been suffered in consequence of the failure of the bank to record the mortgage as second only to that of the Casper Mutual Building & Loan Association. The District Court rendered judgment in favor of Wardlaw and against the bank for the amount adjudged in the foreclosure proceedings to be due Wardlaw, together with interest and costs. The review of that judgment is the purpose of this proceeding.

The contentions urged in behalf of the plaintiff in error are, in substance, that in the handling of the transaction described above, as committed to it by Wardlaw, it was not guilty of the slightest degree of negligence or any lack of diligence; that as the transaction was a mandatary; i. e., a gratuitous bailment for the sole benefit of the bailor, the

bank was only answerable for failure to exercise slight diligence, for its gross neglect, or for its bad faith. There is no contention of bad faith on the part of the bank being in the case.

It may be doubted whether it can fairly be said that the transaction was one entirely for the benefit of Wardlaw. The bank certainly had the use of the money collected from Blodgett until its remittance draft was ultimately cashed. Wardlaw sent his letter of instruction to the bank at the request of Blodgett, who was all the while one of the bank's customers and whose interest and convenience were thereby distinctly aided, consequently advancing the bank's good will among its clientele. However this may be, we shall in the subsequent discussion, nevertheless assume that the bank received nothing for its services in the matter.

There can be no denial of the fact that Wardlaw's letter to the plaintiff in error under date of June 12, 1922, was a request that it act as his agent in the proposed change of securities and collection matter in that letter described and pursuant to the instructions therein contained. Milwaukee National Bank of Wisconsin v. City Bank, 103 U. S. 668, 26 L. Ed. 417. With the assumption suggested above in mind, we are led to inquire what are the rights and liabilities of the parties when the one thus commissioned as agent undertakes a performance of such agency voluntarily.

Professor Mechem, in his oft cited work on Agency, Vol. I, (2d Ed.) § 1258, referring to certain rules governing a gratuitous agency, states them thus:

"If in such a case the agent refuses to enter upon and perform the service at all; if his default consists in the mere not doing of a thing which he had promised to perform, and it be not a case where the *law* imposes upon him the duty to perform it, the fact that the performance was to be gratuitous, that the promise to perform was entirely without consideration, will furnish a complete defense to a claim for damages on account of such default. This is upon the familiar ground that the non-performance of a gratuitous executory contract constitutes no cause of action.

"But where, on the other hand, the agent has entered upon the performance of the service, although it be gratuitous, it then becomes his duty to conform to the instructions given. If he were not willing to do so, he should have declined to serve; but having entered upon the performance of the service, he must obey instructions, and a failure to do so, will subject him to liability for the loss or damage occasioned thereby."

The author lists a number of well considered cases as supporting the principles laid down and many others could be supplied.

In 7 C. J. 589, relative to the same subject, this language is employed:

"The duty of a banker who undertakes, without compensation, to act as trustee or agent for his customer in the making of investments, or otherwise, is to obey instructions and to exercise the same care and diligence which the law requires of gratuitous bailees; that is to say, he must use that degree of caution which a man of ordinary prudence would employ in like circumstances. Failure in this respect is termed gross negligence."

See also 2 C. J. 717, § 372.

The case of Walker v. Smith, 1 Wash. C. C. 152, 4 Dall. 389, Fed. Cas. No. 17,086, is instructive in this connection. There the plaintiffs, who were London merchants, had been requested by one Brown of Philadelphia to sell him a bill of goods. Uncertain as to his solvency and being introduced by a mutual friend to the defendant Smith, they sent the goods to the latter advising him of their fears of Brown and requesting Smith to receive the goods but not to deliver them to the purchaser without payment being made by him or such security given as the defendant should approve. The defendant received the goods and delivered them to Brown without obtaining payment or security. Brown afterwards failed. In stating the law governing the case, Mr. Justice Washington said in part:

"No man can compel another to render him acts of friendship, or services of any kind, whether gratuitously, or with a view to a remuneration. But, if the person applied to, consents to render the service, and undertakes the business, he is bound to act in conformity to the terms on which the request was made. This rule is universal in its application, whatever may be the situations or professions of the parties; but, in commercial agencies, it is of great consequence, that it should be rigidly enforced. The defendant, by receiving the goods, and undertaking to act concerning them, bound himself to hold them, until paid for, or secured by Brown; and on his failure to do either, to dispose of them for account of the plaintiffs. But what has he done? He delivered them to Brown, without receiving payment or security; he did the very thing he was cautioned not to do."

So far as the case at bar presents the aspect of a mandatary or gratuitous bailment, the following authorities are, we think, pertinent. Summing up the result of many cited decisions, the note in 4 A. L. R. 1225 places the legal principles deducible therefrom in this form:

"If a gratuitous bailee undertakes to deal with the subject of the bailment in a manner not warranted by his instructions, express or implied (as where he undertakes, without instructions, or contrary to his instructions, to transmit it to his principal, or if he delivers it to one not authorized by the bailor to receive it, or where without authority, expressed or implied, he delegates to another the performance of the commission undertaken by him), and the property is lost, he is liable therefor, irrespective of any want of due care on his part, unless his act is ratified by the bailor with full knowledge of the circumstances."

When there was a gratuitous bailment of gold for carriage from New York to Providence and it was lost, Mr. Justice Story, in Tracy v. Wood, 3 Mason C. C. 132, discussing the distinctions between slight, ordinary, and gross negligence, matters which have been the source of much confusion as they have been applied in the courts, in the course of his statement of the law of the case, remarked:

"After summing up the facts, said, I agree to the law as laid down at the bar, that in cases of bailees without reward, they are liable only for gross negligence. Such are depositaries, or persons receiving deposits without reward for their care; and mandataries, or persons receiving goods to carry from one place to another without reward. The latter is the predicament of the defendant. He undertook to carry the gold in question for the plaintiff, gratuitously, from New York to Providence, and he is not responsible unless he has been guilty of gross negligence. * * * In determining what is gross negligence, we must take into consideration what is the nature of the thing bailed. If it be of little value, less care is required, than if it be of great value. If a bag of apples were left in a street for a short time, without a person to guard it, it would certainly not be more than ordinary neglect. But if the bag were of jewels or gold, such conduct would be gross negligence. In short, care and diligence are to be proportional to the value of the goods, the temptation and facility of stealing them, and the danger of losing them. * * * It appears to me, that the true way of considering cases of this nature, is, to consider whether the party has omitted that care which bailees, without hire, or mandataries of ordinary prudence usually take of property of this nature. If he has, then it constitutes a case of gross negligence. The question is not whether he has omitted that care, which very prudent persons usually take of their own property, for the omission of that would be but slight negligence; nor whether he has omitted that care which prudent persons ordinarily take of their own property, for that would be but ordinary negligence. But whether there be a want of that care, which men of common sense, however inattentive, usually take, or ought to be presumed to take of their property, for that is gross negligence. The contract of bailees without reward is not merely for good faith, but for such care as persons of common prudence in their situation usually bestow upon such property. If they omit such care, it is gross negligence."

A later view of this matter of degrees of negligence as applied to a gratuitous bailment is well expressed by the New York Court of Appeals, in the leading case of Isham v. Post, 141 N. Y. 100, 35 N. E. 1084, 38 Am. St. Rep. 766, 23 L. R. A. 90, where it is said:

"In the same way, the question whether Post's services in making the loan were or were not to be gratuitous must be deemed settled. The finding is that those services were to be without compensation; and on that ground the appellant claims that Post was a gratuitous mandatary, and liable only for gross negligence. But while no compensation, as such, was to be paid, it does not follow that the banker was freed from the obligation of such diligence as he had promised to those who dealt with him, or was at liberty to withhold from his agency the exercise of the skill and knowledge which he held himself out to possess. Nothing in general is more unsatisfactory than attempts to define and formulate the different degrees of negligence; but, even where the neglect which charges the mandatary is described as 'gross,' it is still true that, if his situation or employment implies ordinary skill or knowledge adequate to the undertaking, he will be responsible for any losses or injuries resulting from the want of the exercise of such skill or knowledge. Story, Bailm. § 182a; Shiells v. Blackburne, 1 H. Bl. 158; Foster v. Bank, 17 Mass. 479; First Nat. Bank v. Ocean Nat. Bank, 60 N. Y. 295. In the latter case, it was said that ordinary care, as well as gross negligence,—the one being in contrast with the other,—must be graded by the nature and value of the property, and the risks to which it is exposed. Post, therefore, was required to exercise the skill and knowledge of a banker engaged in loaning money for himself and for his customers, because of the peculiar character and scope of his agency, because of his promise of careful attention, and because the contract was made in reliance upon his business character and skill."

And by Mr. Justice Field in Preston v. Prather, 137 U. S. 604, 11 Sup. Ct. 162, 34 L. Ed. 788:

"The general doctrine, as stated by text writers and in judicial decisions, is that gratuitous bailees of another's property are not responsible for its loss unless guilty of gross negligence in its keeping. But gross negligence in such cases is nothing more than a failure to bestow the care which the property in its situation demands; the omission of the reasonable care required is the negligence which creates the liability; and whether this existed is a question of fact for the jury to determine, or by the court where a jury

is waived. See Steamboat New World v. King, 16 How. 469, 474, 475; Railroad Co. v. Lockwood, 17 Wall. 357, 383; Milwaukee & St. Paul Railway v. Arms, 91 U. S. 489, 494.''

See also 4 Michie on Banks, ch. 7, § 39, p. 42; Wolf Company v. State Bank Commissioner, 71 Colo. 486, 208 Pac. 462; Wegner v. First National Bank of Casselton, 42 N. D. 397, 173 N. W. 814; Bank of Newington v. Bossert Corporation, 165 S. E. (Ga. App.) 887; Allen v. Adams, 140 A. (Del. Ch.) 694; Security National Bank v. Home National Bank, 106 Kan. 303, 187 Pac. 697; Bock v. First National Bank of Horton, 123 Kan. 304, 255 Pac. 68.

The trial court made a general finding in favor of the plaintiff. This implies a finding that the bank did not obey the instructions given it by Wardlaw and did not conduct the transaction entrusted to its care as such a matter should ordinarily have been handled and that loss resulted to Wardlaw in consequence of such failure in the performance of its duty. The rule is that if there is substantial evidence to support a finding made by the trial court, it will not be disturbed. White Automobile Co. v. Hamilton, 31 Wyo. 390, 226 Pac. 687; Huber v. Glenrock State Bank, 32 Wyo. 357, 234 Pac. 31; Carter Oil Co. v. Gibson, 34 Wyo. 33, 241 Pac. 219; Gray v. Elliott, 36 Wyo. 361, 255 Pac. 593. We think the evidence set forth in the record before us as outlined above, complies with this rule.

Wardlaw sent the bank the Blodgett mortgage and note held by him together with a release of the mortgage lien, directing it to collect $250 at least, from Blodgett, he to execute a new note and mortgage in lieu thereof on the same property, the last mentioned instrument to be recorded and, with the new note and check for amount paid, to be sent on to Wardlaw. The bank was explicitly told that Blodgett "pays the expenses." All of these directions were equally important, were to be construed together and furnished the measure of the bank's duty and authority in the performance of the agency.

Now what did the agent do? Notwithstanding it obtained from Blodgett only a part of the expenses—the amount necessary to pay for drawing the new note and mortgage and for recording the release of the original lien held by Wardlaw—it nevertheless went ahead with the change in securities and left the new mortgage executed by the Blodgetts to Wardlaw off the record in the county clerk's office for months and that record wide open for other liens to step in and take precedence as ultimately occurred. The business world generally knows the result flowing from placing the release of a mortgage on record without recording a new lien if one is to be taken. The bank itself, accustomed as it was to handling notes, mortgages, and releases as part of its ordinary business, knew the consequences of such action on its part, for its cashier testified, "if a man has a mortgage or piece of property and it isn't on record, in order to be himself safe he should put it on record, shouldn't he?"

If the agent, doing as it should, had insisted on obtaining all the expense money before any papers were surrendered, this litigation would not have arisen. The bank had it in its power and authority to so insist. The ordinary conduct of a matter of this kind would dictate such a procedure. Even after the Blodgett payment had been placed in its hands, if the bank had forthwith paid the recording fee of the new mortgage from that amount and remitted the balance, the situation would have been saved as against such loss as finally ensued. The agent clearly did not bestow the care upon the transaction which the matter reasonably demanded and it did not obey the instructions given by which it was to be rigily guided. Under the authorities cited above, it made itself liable for any loss to its principal resulting from its action. The bank was not obligated to take the agency, of course, but having done so, it was unquestionably bound to obey instructions and give to the matter the reasonable care the business demanded.

It is said that the letter of September 11, 1922 mentioned above apprised Wardlaw of the necessity for prompt action on his part in forwarding the recording fee for the new mortgage and that he paid no attention thereto. If this were the fact, then, inasmuch as the mortgages which were adjudged precedence over Wardlaw's lien were placed of record weeks after that date, we might be obliged to reach a different result. While it is true that the bank's cashier testified, as we have seen, that the letter was in due course mailed to Wardlaw, yet Wardlaw testified on cross-examination: "They kept my mortgage from July 30 until November without my ever knowing a thing about it. They answered by saying it was ready now to file if I would send them $2.50, when the agreement was that Blodgett was to pay all expenses." The letters of Wardlaw to the bank under date of November 3, 1922 and that of the bank to Wardlaw of November 17 following make no reference whatsoever to the letter of September 11 preceding. It is apparent the evidence concerning the receipt of the letter of September 11 by Wardlaw was conflicting. That conflict, the trial court saw fit to resolve, as it had the authority to do, against the bank.

We must necessarily conclude, therefore, that the judgment before us for review should be affirmed.

*Affirmed.*

KIMBALL, C. J., and BLUME, J., concur.