BOYD, RESPONDENT, *v.* HARRISON STATE BANK, APPELLANT,

and

MARSHALL ET AL., RESPONDENTS, *v.* HARRISON STATE BANK, APPELLANT.

(No. 7,499.)

(Submitted March 6, 1936.  Decided March 23, 1936.)

[56 Pac. (2d) 724.]

*Messrs. Duncan & Duncan,* for Appellant, submitted an original and a reply brief; *Mr. M. M. Duncan* argued the cause orally.

96

*Mr. James A. Flint, Mr. H. L. Maury* and *Mr. A. G. Shone,* for Respondents, submitted a brief; *Mr. Maury* argued the cause orally.

MR. JUSTICE ANDERSON delivered the opinion of the court.

These are appeals from separate judgments in favor of the plaintiffs in two actions, consolidated for trial, each of which was against the same defendant. Each action was brought to recover the value of Liberty Bonds which the plaintiff in each action had delivered to the defendant for safekeeping, the property being lost as a result of the robbery of the defendant bank, the bonds of each of the plaintiffs being taken during the same robbery.

The plaintiffs in their respective complaints allege the corporate capacity of the bank, the delivery of the bond or bonds to the defendant for safekeeping, plaintiffs' ownership of the bonds, the failure of the defendant to redeliver the bonds on demand, and their value. The defendant by its answer in each case admitted its corporate capacity, the delivery of the bonds, but denied the ownership of plaintiffs, and denied generally the other allegations of the complaint, except it was admitted that demand was made for the redelivery of the bonds and that the bank was unable to comply with the request. Defendant affirmatively alleged that the bonds were kept by the bank gratuitously in its vault with its own property of like kind and value, and that on October 27, 1930, the bank was robbed or

burglarized without its fault or negligence, and the bonds, together with the property of the bank of like character, were taken by the robbers. It was also affirmatively alleged that the defendant gave ordinary and slight care to the protection of the bonds and used the same degree of care to protect them as it used for the care and preservation of its own property. The plaintiffs by reply denied the affirmative allegations set forth in the answer, except they admitted that the bonds were carried away from the banking house, and alleged that the defendant was negligent in certain respects.

The cases were tried before the court sitting with a jury. At the close of the plaintiffs' testimony, defendant moved for a directed verdict in each case, which motions were by the trial court denied. Thereupon plaintiff in each case moved for a directed verdict, which motions were granted. The defendant has appealed from the separate judgments entered in conformity with the directed verdicts. By appropriate specifications of error, defendant asserts that the trial court was in error in denying its motions for directed verdicts and granting plaintiffs' motions for such verdicts.

Counsel for the respective parties assert that the evidence is undisputed and free from conflict. The evidence on behalf of the plaintiffs established beyond question the allegations of their complaints. The bank of the defendant contained a vault within which was a cannon-ball safe. The vault was opened by a combination; the safe within the vault had a time lock and also a combination. The bank kept the bonds of these plaintiffs in the safe within the vault where its own bonds and currency were likewise kept. In the working room of the bank was another cannon-ball safe which likewise had a time lock and combination, in which the bank usually kept silver coin. It was the custom of those employed in the bank to close these safes, set the time locks and combinations, and set the combination on the doors of the vault at the close of each day's banking business. The banking hours were from 9 in the forenoon until 3 in the afternoon, and it was usual to close and lock the safes

and vault as soon after 3 o'clock as the business was completed, except that occasionally, when a directors' meeting was to be held in the evening, the vault was left unlocked.

At the time the bonds were stolen, and for some time prior to that date, James E. Kreigh was the cashier of the bank, and T. E. Williams was the assistant cashier. They were the only persons regularly in the employ of the bank. Both were familiar with the combinations to the safes and vault, and had keys to the outside door of the bank. Karl Elling was the president of the bank; he resided at Virginia City, and he and the Elling estate, which he represented, were the principal stockholders of the institution. F. W. Bleck was the cashier of a bank in Virginia City in which Mr. Elling was interested, and was one of the managing officers. Bleck at one time had been employed in the defendant bank and, when Elling was unable to attend directors' meetings of the defendant, usually attended as his representative. Bleck also knew the combinations to the safes and the vault and occasionally visited the bank for the purpose of checking over its affairs.

It appears that one Rundell was a director of the defendant bank. On October 20, 1930, Ralph Harrington, who was a nephew of Mrs. Rundell, the wife of the director of the bank, informed Mr. Rundell, Mr. Young, another director of the bank, and the cashier and assistant cashier, that certain persons contemplated the robbery of the bank at a future date. Harrington informed these parties that he had overheard the plans of these bank robbers. Later, on the 22d or 23d of October, Mrs. Rundell telephoned the cashier and requested him to come to the Rundell ranch, distant about eight miles from Harrison. He complied with her request and was informed by her that Harrington and the two men who planned to hold up the bank had been at the ranch the night before, had driven into Harrison that morning, and upon their return had divulged the information to Mrs. Rundell as to their plans. The cashier upon his return requested Mr. Bleck to have the sheriff and the president of the bank come to Harrison at once. The sheriff complied with his request, but Mr. Elling was away and did

not appear in Harrison at that time. The sheriff was informed as to the contemplated robbery upon his arrival at Harrison, but it was then unknown as to when the robbery would occur. The sheriff deputized several of the citizens as deputy sheriffs on that occasion. The cashier and director Young next day or so called at Virginia City, interviewed the county attorney, and encountered the sheriff near Silver Star, and the sheriff gave the cashier instructions to stay away from the bank on account of information which he had received that the robbers intended to kidnap him and torture his wife. The cashier worked in the bank on Saturday and, having secured information that the robbery was likely to occur on Monday evening, left and, in accordance with the direction of the sheriff, did not return to the bank until after the robbery. During the interim he and his wife sojourned on the Beall ranch, about six miles from Harrison.

Harrington communicated to the sheriff the plans of the robbers which he had overheard and in whose company he had been at various times. On Monday, October 27, 1930, the sheriff and undersheriff went to the town of Harrison and directed Williams, who was in charge of the bank on that day, when he left the bank, not to set the time locks on the safes or the combination on the safes and vault. Williams testified that after the close of the business day he complied with the sheriff's request and did not set the time lock on either safe, but turned the combination on the safes and vault a few numbers so that they could be opened by merely turning the dial to the last number of the combinations. It appears that the sheriff had discussed with Mr. Elling and Mr. Bleck the matter of his plans with reference to dealing with the contemplated bank robbery, and he suggested that the services of a deputy sheriff from Butte be procured to sit in the bank at the time the robbery was anticipated, but Elling and Bleck were unwilling to assent to this arrangement, and at their suggestion it was agreed that Bleck would be in the bank on Monday evening at that time. The sheriff posted his deputies in a store and garage near by, so that the front entrance would be within the range of their fire-

arms with which they were equipped. Bleck took his station in the bank, opened the vault, removed some books, and proceeded to await the course of events. He was informed by telephone that the robbers were in town, communicated with the sheriff; he expected the sheriff at the bank and unlocked the front door. About 9 o'clock in the evening Harrington entered the bank with a revolver in his hand and informed Bleck that the robbers were coming, and directed Bleck to obey his commands. Bleck had never seen Harrington prior to that time and was not certain that it was Harrington who had entered the bank. In short order another individual, masked and likewise carrying a revolver, entered the bank; Bleck was ordered to proceed into the vault and open the safe. This he did after some difficulty and the masked bandit removed the currency and the bonds; Bleck was ordered to proceed to the working room and open the other safe, which he did; the masked bandit removed the silver coins therefrom, delivered a portion of these coins to Harrington, and directed Harrington to watch Bleck who was in the meantime lying face down on the floor in accordance with previous commands. The masked bandit directed Harrington to watch Bleck, and proceeded to the back door of the bank, and then returned and, after directing Harrington to continue his watch over Bleck, went out through the front door of the bank into the street, where several shots were fired at him by the sheriff's deputies in the store, and also by one of the deputies stationed at the garage. The bandit fell to the ground but rose and proceeded to a fence and escaped. A considerable number of silver coins were found on the ground where he fell, some of which were mutilated presumably as a result of the shots fired; blood stains were found on the ground as far as the fence. Harrington, after the departure of the masked bandit from the bank, placed the silver which had been delivered to him in front of the safe. While the bonds and currency were being extracted from the safe within the vault, Bleck was compelled to stand with his face toward the wall and could not observe the proceedings.

The officers of the bank testified—and it is not disputed—that no compensation was received for keeping these bonds, the property of plaintiffs. It was not shown that the defendant bank sought the delivery of the bonds for safekeeping. The cashier testified that on the Saturday preceding the robbery, which occurred on the Monday following, one of the customers of the bank who was a personal friend called, and the cashier, who informed the customer of the plan, at that time returned to the latter from the vault of the bank a diamond ring which was kept in the cashier's personal safety deposit box.

Defendant argues in support of its contention that its motions for directed verdicts should have been granted, that the bank was only a gratuitous depositary, that it was only duty bound to exercise slight care for the safekeeping of the bonds, liable only for their loss in the event they were lost as a result of the gross negligence of the bank, and that when the bank exercised the same degree of care over the property of plaintiffs as it did over its own property of like value and kind, its duty was discharged.

Section 7656, Revised Codes 1921, provides: "Gratuitous deposit is a deposit for which the depositary receives no consideration beyond the mere possession of the thing deposited." Section 7658 declares: "A gratuitous depositary must use at least slight care for the preservation of the thing deposited."

In many cases is found language to the effect that if the bailee keeps the property entrusted as he keeps his own, although he keeps his own negligently, he is not guilty of gross negligence or answerable for the property. (3 R. C. L. 101; Schouler on Bailments and Carriers, 3d ed., 46; 5 Michie on Banks and Banking, 653.) It may also be noted that many courts refuse to recognize degrees of negligence or diligence. (*Maddock* v. *Riggs*, 106 Kan. 808, 190 Pac. 12, 12 A. L. R. 216.) However, in view of our statutory provisions we are compelled to recognize degrees of negligence in this class of cases. We think the rule for which defendant contends, namely, that the bailee is absolved of all liability if he takes

the same care of the bailor's property as he does of his own, is, as applied to every situation, unsound, for as is pointed out in many decisions in circumstances of a particular case, a bailee may be grossly negligent as to the care of his own property. (*Maddock* v. *Riggs*, supra; *Maloney* v. *Merchants' Bank*, 141 Ark. 578, 217 S. W. 782.)

In 3 R. C. L. 102, it is said: "The view that seems to express more accurately the meaning of the rule and certainly the one more consonant with reason and justice, is that while the depositary is bound to slight diligence only, and the measure of that diligence is that degree of diligence which persons of less than common prudence, or indeed of any prudence at all, take of their own concerns, the measure, abstractly considered, has no reference to the particular character of an individual, but looks to the conduct and character of a whole class of persons. Hence a gratuitous bailee will not, under this interpretation, be permitted to absolve himself from all responsibility for the care of an article bailed merely by proving that he has been likewise negligent with his own goods."

Mr. Schouler, in his work on Bailments and Carriers, third edition, at page 49, with reference to this rule declares: "Doubtless, as Lord Holt has observed, if the bailee is an idle, careless, drunken fellow, and comes home drunk and leaves all his doors open, so that the bailor's goods are stolen with his own, it was the bailor's own folly to trust such an idle fellow. But suppose, on the other hand, the bailee was a man habitually discreet and sober and of good reputation, who on this particular occasion came home drunk and left all his doors open, would the bailor have to bear reproach and take his own share in the loss? Another consideration, sometimes alluded to, which bears against such a test, is that one may with respect to his own property choose deliberately to encounter extra risks such as he cannot justifiably as regards that of which he is only bailee. But, as a presumption, the maxim is of much service."

Under the evidence in this case, the defendant did not exercise the care for the preservation and safekeeping of the

plaintiffs' property that it ordinarily and usually exercised for the safety of its own property of like character, and accordingly the trial court was not in error in denying defendant's motions.

It is contended on behalf of the plaintiffs that the bailment ▮ in question was not gratuitous, in that banks, by keeping bonds and valuable papers without direct compensation, indirectly from such transactions induce customers to deal with the bank in other matters resulting in a profit to it. Some decisions have announced such a rule as applied to the facts in particular cases, as illustrated by the case of *Miller* v. *Bank of Holly Springs*, 131 Miss. 55, 95 So. 129, 31 A. L. R. 698. However, there is no evidence here of the bank in question seeking, and, as banks sometimes do, advertising for, the deposit of bonds and other valuable papers of customers without compensation. We are unwilling, as applied to the facts in this particular case, to adopt the rule for which plaintiffs contend.

In the case of *Gray* v. *Merriam*, 148 Ill. 179, 35 N. E. 810, 812, 39 Am. St. Rep. 172, 32 L. R. A. 769, it was written: "The liability of banks, acting as bailees without reward in the case of special deposits has been recently considered in the case of *Preston* v. *Prather*, 137 U. S. 604, 11 Sup. Ct. 162 [34 L. Ed. 788]; and it was there held that such bailees are bound to exercise such reasonable care as men of common prudence usually bestow for the protection of their own property of a similar character; that the exercise of reasonable care is in all such cases the dictate of good faith; and that the care usually and generally deemed necessary in the community for the security of similar property, under like conditions, would be required of the bailee in such cases, but nothing more. ▮ Gross negligence, as applied to gratuitous bailees, is defined in that case to be "nothing more than a failure to bestow the care which the property in its situation demands." To the same effect is the case of *Maddock* v. *Riggs*, supra.

The undisputed evidence in this case discloses that the officers of the bank failed to utilize any or all of the devices

with which their safes and vault were equipped, designed to prevent the theft of its money and securities on the night in question, although they had been advised and believed that a robbery was impending and which occurred in conformity with their expectations.

It is argued on behalf of defendant that the officers of the bank had confidence in the peace officers and turned the entire matter of the protection of its property into their keeping. However, the officers of the bank were unwilling to accept the plan of the sheriff in its entirety and refused to permit a stranger to occupy a post in the bank during the evening while waiting the coming of the robbers, and insisted upon a deviation of the plan to the extent that one of their number occupied this place; so it is clear that nothing was done without their consent and approval. No effort was made to remove the property of these plaintiffs from the banking house to some other place of safety, and no attempt was made to in any way prevent the taking of such property by the robbers. The whole plan adopted with the consent of the officers of the bank had for its purpose, not the prevention of the commission of the robbery, but the extermination of the robbers. The defendant's duty which it owned to the plaintiff was to use slight care for the preservation of their property, and this the record discloses the defendant failed to perform. Evidence of greater care than was here exercised has been held sufficient to sustain a verdict finding gross negligence, in the cases of *Merchants' Bank* v. *Affholter,* 140 Ark. 480, 215 S. W. 648, and *Pattison* v. *Syracuse National Bank,* 80 N. Y. 82, 36 Am. Rep. 582.

But it is argued on behalf of the defendant that negligence [5] is always a question of fact for the jury, and that the court should have submitted the case to the jury. ''When the evidence is clear and satisfactory, and of such character that, if it should be submitted to the jury and a verdict be rendered contrary to it, the court would be required to set the verdict aside, then the court may direct a verdict.'' (*Bean* v. *Missoula Lumber Co.,* 40 Mont. 31, 104 Pac. 869, 871; *McIntyre*

v. *Northern Pacific R. Co.*, 56 Mont. 43, 180 Pac. 971; *Stiemke* v. *Jankovich*, 72 Mont. 363, 233 Pac. 904.) Such was the condition of this case.

Judgments affirmed.

Mr. Chief Justice Sands and Associate Justices Matthews and Morris concur.

Mr. Justice Stewart, being disqualified, takes no part in the foregoing decision.